1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2

3    --------------------------------X
                                    :
4    SINGH, et al..,                :
                                    :   17-CV-01387 (BMC)
5              Plaintiffs,          :
                                    :   225 Cadman Plaza East
6              v.                   :   Brooklyn, New York
                                    :
7    SUNN ENTERPRISE GROUP, LLC,    :   October 12, 2017
     et al.,                        :
8                                   :
               Defendants.          :
9    --------------------------------X

10      TRANSCRIPT OF CIVIL CAUSE FOR INQUEST DAMAGES HEARING
                BEFORE THE HONORABLE STEVEN M. GOLD
11            UNITED STATES CHIEF MAGISTRATE JUDGE

12   APPEARANCES:

13

14   For the Plaintiffs:        JONATHAN SILVER, ESQ.
                                80-02 Kew Gardens Road
15                              Kew Gardens, New York 11415

16

17   For the Defendants:        BOGDAN MARKOVSKI, Pro Se
                                90 Dayton Avenue
18                              Suite 210
                                Passaic, New Jersey 07055
19

20   Punjabi Interpreter:       DAVE CHATTERJDE

21

22   Court Transcriber:         SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
23                              211 N. Milton Road
                                Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service

1                                                                                  2

2

3                              I N D E X

4                                                              Further
                      Direct  Cross  Redirect  Recross  Redirect
5

6    WITNESSES:

7    Devender Singh          8     16              118

8    Jagit Singh            22     25

9    Baljinder Singh        28     30

10   Puma Singh             32     38     52     53

11   Dulla Singh            62     64

12   Prabhjit Singh         69     72

13   Joga Singh             78     80

14   Mohinder Singh         84     85

15   Armajit Singh          92     94

16   Karnail Singh          99    101

17   Kundan Lal            108    110

18   Bogdan Markovski      120    122

19   EXHIBITS                              Marked   Received

20   PLAINTIFF:

21   DS-1   Record of hours worked                    11

22   2      Dulla Singh's work records                64

23   3      Work hours                                 71

24   4      Joga Singh document                        79

25   5      Mohinder Singh document                    85

```
 1                                                          3

 2

 3                        I N D E X

 4                       (Continued)

 5   EXHIBITS                           Marked    Received

 6   PLAINTIFF:

 7   6        Amarjit Singh document               93

 8   7        Karnail Singh document              101

 9   8     Kundan Lal document                    110

10

11   COURT:

12   1     Paper from pocket                       37

13   DEFENDANT:

14   1        Pay stubs                            51

15   2        Pay stubs                            51

16   3        Pay stubs                            51

17   4        Certificate of Insurance            57

18

19

20

21

22

23

24

25
```

4

1  (Proceedings began at 2:03 p.m.)

2       THE COURT:  <u>Singh v. Sunn Enterprise Group, LLC</u>, 17-

3  CV-1387.

4       Counsel for plaintiff.

5       MR. SILVER:  On behalf of the plaintiffs, Your

6  Honor, Jonathan Silver.

7       THE COURT:  Mr. Silver, how are you?

8       MR. SILVER:  Very good, Your Honor.

9       THE COURT:  And you sir, are?

10       MR. MARKOVSKI:  Bogdan Markovski.

11       THE COURT:  Could you spell your last name for me?

12       MR. MARKOVSKI:  M-A-R-K-O-V-S-K-I.

13       THE COURT:  Mr. Silver, is Mr. Markovski an

14  individual against whom you have a default?

15       MR. SILVER:  Yes.

16       THE COURT:  Mr. Markovski, as you probably are

17  aware, only an entity like an LLC may appear only through

18  counsel.  It does not have the right to be represented by a

19  non lawyer principal.  You, however, are also a defendant in

20  this case in your own right and you have a right to defend

21  yourself if that's your choice.  There's already been a

22  default entered against you.  That means that your liability

23  is assumed and the only question is how much in damages the

24  court will adjudicate that you owe.  Do you understand me?

25       MR. MARKOVSKI:  Yes.

1          THE COURT:  The reason we're here today is that the

2     plaintiffs have submitted documents in support of their claim

3     for damages.  United States District Judge Cogan found that

4     presentation incomplete or inadequate to make the findings of

5     fact that he felt were necessary to render a judgment and he

6     referred the matter to me to conduct a hearing on the amount

7     of damages to be awarded.

8          Today we're going to have that hearing.  Mr. Silver

9     will call the plaintiffs forward I presume and ask them to

10    testify.  If you want to ask them questions or testify

11    yourself you may and I'll consider it in deciding how much in

12    damages to recommend that Judge Cogan award.  Is that clear?

13         MR. MARKOVSKI:  Yes.

14         THE COURT:  Mr. Silver, anything else?

15         MR. SILVER:  No, I think that's it, Your Honor.

16         THE COURT:  Okay.  So when we get started let me

17    alert both sides to what I have before me and what questions

18    have crossed my mind as I look at it.  I have a feeling that

19    this may all be a result of some confusion in the way the --

20    frankly, Mr. Silver, the papers were prepared.

21         MR. SILVER:  I do agree.

22         THE COURT:  So what I'm looking at before me is the

23    motion that -- for default judgment that the plaintiffs filed

24    at docket entries et seq., meaning that I'm looking at the 20

25    and 20-1 through 20-5.

6

1         In the affidavits submitted by those plaintiffs who

2    submitted them there are references to working approximately

3    50 some odd days and 72 hours of overtime just to taken

4    Devender Singh's affidavit as an example.

5         There's no explanation of the interval of time over

6    which those 53.5 days were worked except for August through

7    October.  There is no indication of when those 72 hours of

8    overtime were worked.  There's no indication of how the 37.50

9    an hour wage was determined.  Perhaps most confusingly there's

10   a chart that purports to reflect Devender Singh's damages.

11   Attached as 20-4 at Page 2 of 7 which lists the period from

12   October through 80 but only has hours worked for one of those

13   weeks, 80 hours, with 40 hours of overtime, not the 72

14   described in the affidavits.

15        Although I haven't had the privilege of an informal

16   discussion with Judge Cogan about the case I am suspecting

17   that these are the reasons His Honor decided that a hearing

18   rather than an attempt to render a judgment based upon the

19   documents before the court was the appropriate course.

20        Mr. Silver, how do you propose to proceed?

21        MR. SILVER:  I intend to call a witness and try to

22   talk about those issues.

23        THE COURT:  I'm happy to hear your first witness.

24        MR. SILVER:  I call Devender Singh.

25        THE COURT:  Mr. Singh, please come forward and be

7

1  sworn.  Right up here, sir.  Mr. Singh, take your earpiece out

2  of your ear unless it's a hearing aid.  Sit down.  Before you

3  sit down, raise your right hand.

4                  DEVENDER SINGH, PLAINTIFF, SWORN

5          THE COURT:  Let me have the interpreter's name,

6  please.

7          THE INTERPRETER:  Dave, Last name, C-H-A-T-T-E-R-J-

8  D-E.

9          THE COURT:  I'm sorry but I need it again.  Dave --

10          THE INTERPRETER:  C-H-A-T-T-E-R-J-D-E.

11          THE COURT:  Chatterjde?

12          THE INTERPRETER:  Yes, correct.

13          THE COURT:  All right.  Mr. Singh, please sit down.

14  Mr. Chatterjde, please raise your right hand.

15              DAVE CHATTERJDE, INTERPRETER, SWORN

16          THE COURT:  Mr. Chatterjde, into what language are

17  you translating my words?

18          THE INTERPRETER:  Punjabi.

19          THE COURT:  Mr. Singh, are you able to understand

20  everything I'm saying once Mr. Chatterjde translates it into

21  Punjabi for you?

22          MR. SINGH:  Yes.

23          THE COURT:  Mr. Silver, you may inquire.

24          MR. SILVER:  Thank you, Your Honor.

25                  DIRECT EXAMINATION

Devender Singh - Direct                                8

1  BY MR. SILVER:

2  Q.   Mr. Singh, you're here to collect money that you have not

3  been paid for the work you performed for Sunn Enterprises and

4  Bogdan Markovski?

5  A.   He didn't pay.

6  Q.   You didn't receive any payment; correct?

7  A.   No.

8          THE COURT:  Mr. Silver, I know that there's no

9  adversary counsel and I know there's no jury.  So a little

10 leading to move us along is fine but leading on the heart of

11 the case is objectionable.  All right?

12         MR. SILVER:  Very good.

13 Q.   Did you -- did you work for Sunn Enterprises and Bogdan

14 Markovski?

15 A.   Yes.

16 Q.   And you worked at three different locations?

17 A.   Yes.

18 Q.   Can you describe the three locations you worked?

19 A.   One is Flushing, Parson Boulevard.

20         THE COURT:  When he speaks in English I can

21 understand him.

22         THE WITNESS:  A little bit.  A little bit.

23 A.   Second is Brooklyn, third also Brooklyn.

24 Q.   The location in Flushing, where was that?  What kind of

25 building was that?

Devender Singh - Direct                          9

1   A.    Church.   Church.

2   Q.    And the two buildings in Brooklyn, what kind of buildings

3   were those?

4   A.    Schools.

5            MR. SILVER:  May I present a document to the

6   witness?

7            THE COURT:  You may.  Why don't you show Mr.

8   Markovski what it is you're going to show the plaintiff.

9                    [Pause in proceedings.]

10  Q.    I'm going to show you two pages.

11  A.    This is written by me.

12  Q.    What information is on those two pages?

13  A.    It is written here 53 and a half days I was not paid.

14  Q.    But is this a list of the days that you worked that you

15  were not paid?

16  A.    Yes.

17  Q.    Looking at like the first item, the first line it says

18  Monday eight.  Does that mean Monday, August 8?

19  A.    Yes.

20  Q.    The No. 1 next to that, does that mean you worked a full

21  day, one full day?

22  A.    Yes.  Eight hours.

23  Q.    Okay.  Then if you go across the front of the top line it

24  says -- it has a No. 20 and then it has THU which I guess

25  means Thursday; correct?

Devender Singh - Direct                              10

1  A.    Yes, one and a half day.

2  Q.    One and a half days.  So if one day is eight hours how

3  much is one and a half days?

4  A.    Twelve hours.

5  Q.    So is this a list of all the days and the -- by that

6  information the number of hours you worked on each of those

7  days?

8  A.    Yes.

9  Q.    You were not paid anything for any of that work?

10  A.    No, nothing.

11  Q.    How much were you told that you were going to be paid,

12  what was the agreement?

13  A.    $300.

14          THE COURT:  Per what?

15          THE WITNESS:  For when I worked.

16          THE COURT:  $300 for what, an hour, a day, a month,

17  a year?

18          THE WITNESS:  Per day.  Per day.

19          THE COURT:  $300 per day.

20  BY MR. SILVER:

21  Q.    So whenever we have a notation here of one and a half

22  that means you worked 12 hours for that day?

23  A.    Yes.

24          MR. SILVER:  I offer that document into evidence at

25  this time.

                    Devender Singh - Direct                    11

1              THE COURT:  Why don't you mark it?  Did you bring

2   exhibit stickers?

3              MR. SILVER:  I did not.  Sorry.

4              THE COURT:  We'll give you some.  Do you want to

5   mark it Plaintiff's DS-1?  Plaintiff's DS-1 in evidence.

6                   (Plaintiff's Exhibit DS-1, Received.)

7              THE COURT:  Mr. Singh, when did you prepare that

8   record?

9              THE WITNESS:  Every day when I used to go to work I

10  used to write down how many hours each day I worked.

11             THE COURT:  Who told you they would pay you $300 a

12  day?

13             THE WITNESS:  This is usual -- this was Saturday

14  [inaudible] days.

15  BY MR. SILVER:

16  Q.   Was there an agreement between you and the people you

17  were working for that that's what they were going to pay you?

18  A.   Yes, we have no other settlement [sic] except I was told

19  by him that I was going to get $300.

20             THE COURT:  Who's the him?

21             THE WITNESS:  Sasha.

22             THE COURT:  Who's Sasha?

23             THE WITNESS:  The guy's partner.

24             THE COURT:  When you say the guy you're pointing to

25  Mr. Markovski?

```
                    Devender Singh - Direct                  12
```

1       THE WITNESS:  Yes, that -- every day Sasha used to

2  come and we used to work with Sasha, his partner.

3       THE COURT:  Go ahead.  Do you have anything else for

4  him?

5  BY MR. SILVER:

6  Q.   Did you have a meeting in New Jersey with Sasha and his

7  partner?

8  A.   Yes.

9  Q.   Did you have a conversation about the fact that you had

10 not been paid?

11 A.   Yes, we had.

12 Q.   So you requested it to be paid and what was the response?

13 A.   He told me that the main company didn't pay us so you

14 should go to the court.

15      THE COURT:  When you said you had a meeting in New

16 Jersey, who was there?

17      THE WITNESS:  This guy and Sasha.

18      THE COURT:  Let the record reflect that the

19 defendant --

20      THE WITNESS:  And --

21      THE COURT:  Excuse me.  Let the record reflect that

22 the witness pointed to the defendant Mr. Markovski.  And who

23 else?

24      THE WITNESS:  And one lady.

25      THE COURT:  Okay.

```
                Devender Singh - Direct                    13
```

 1 | BY MR. SILVER:

 2 | Q.   And any of the other gentlemen who are here with you

 3 | today, were they present?

 4 | A.   Five or six guys were there.  All three are raising

 5 | hands.

 6 | Q.   The number of days and the number of hours you worked, do

 7 | you know Jagjit Singh, an individual by that name?

 8 | A.   Yes.

 9 | Q.   Is he here today?

10 | A.   Yes.

11 | Q.   The kind of work that you were doing at the work site,

12 | can you describe that to the -- to His Honor?

13 | A.   [Inaudible]

14 | Q.   Jagjit Singh, was he doing the same kind of work at the

15 | same location?

16 | A.   Yes, [inaudible].

17 | Q.   Every day that you went to work at those locations you

18 | gave, you described, Jagjit Singh did he also go to work on

19 | all of those days?

20 | A.   Yes.  Same [inaudible] we used to work together.

21 | Q.   So when you worked eight hours he worked eight hours?

22 | A.   Yes.  Same thing.

23 | Q.   When you worked 12 hours he worked 12 hours?

24 | A.   Yes.

25 | Q.   On the same date?

```
              Devender Singh - Direct                    14
```

1   A.    Yes.

2   Q.    He was to be paid the same amount as you?

3   A.    Yes.

4   Q.    How about an individual by the name of Baljinder Singh,

5   did he work at the same location you just described?

6   A.    Yes.

7   Q.    Did all the things that you did, did he do those things

8   as well?

9   A.    Yes, same work.

10  Q.    On the days that you worked did he work?

11  A.    Same everything.

12  Q.    On the hours you worked on each of those days did he

13  work?

14  A.    Yes, same hours.

15  Q.    When you worked eight hours he worked eight hours?

16  A.    Yes.

17  Q.    When you worked 12 hours he worked 12 hours?

18  A.    Yes.

19  Q.    What kind of work did he do?

20  A.    Brick works.

21  Q.    How much was he to be paid as well?

22  A.    300.

23  Q.    That's the same amount as yourself?

24  A.    Yes.  Brick work, same amount.

25  Q.    Is there an individual by the name of Puma Singh?

```
                    Devender Singh - Direct                    15
```

1  A.    Yes, same thing.

2  Q.    If I asked you all the same questions about Puma Singh

3  would I get all the same answers?

4  A.    Same.

5  Q.    Just to clarify, he did work at the same locations?

6  A.    Yes.

7  Q.    On the same dates?

8  A.    Yes.

9  Q.    The same hours?

10  A.    Yes, sir.

11  Q.    Doing the same kind of work?

12  A.    Yes.

13  Q.    Was he supposed to be paid the same amount?

14  A.    Yes, 300.

15         MR. SILVER:  I have no further questions at this

16  time.

17         THE COURT:  Mr. Markovski, do you want to ask him

18  anything?

19         MR. MARKOVSKI:  Sure.

20         THE COURT:  Go ahead.

21                    CROSS-EXAMINATION

22  BY MR. MARKOVSKI:

23  Q.    Mr. Devender Singh, you stated that I had hired you

24  directly to perform work on this three locations.  Aberdeen

25  Street, 29th Street in Brooklyn and Parsons Boulevard in

Devender Singh - Cross                              16

1   Flushing.  Is that correct?

2   A.    Yes.

3   Q.    So you came to my office and you asked me for work and I

4   hired you directly and I said you're going to be paid $300 a

5   day plus you're working overtime and you got to get paid the

6   overtime hours.

7            MR. SILVER:  Objection.

8            MR. MARKOVSKI:  Well, he not representing the

9   company.  So I'm just defending myself.

10           THE COURT:  Yes, but he's objecting to your question

11  but you hadn't finished it yet.  He thought you had.  Go ahead

12  and finish your question.  Don't translate it until I rule on

13  the objection.

14  Q.    So you tell me that you came to my office, you asked me

15  for work and I said yes, I have work for you and I'm going to

16  put you down on this three locations for this date stated and

17  you're going to be paid the $300 per day.  Is that correct?

18           MR. SILVER:  Objection.

19           THE COURT:  On what grounds?

20           MR. SILVER:  That he's challenging the liability

21  portion of this.

22           THE COURT:  No, he isn't.  Overruled.  You can

23  translate the question.

24  A.    There's no such conversation in the office.

25  Q.    Okay.  You changed your mind before when you said that

1   it's normal for a worker of your caliber to get paid $300 for

2   the work that you were performing.  Correct?  It was never

3   discussed; correct?

4             MR. SILVER:  Objection.

5             THE COURT:  Sustained.  Who told you -- did anybody

6   tell you you were going to get $300 a day?

7             THE WITNESS:  No, but this was the usual rate.

8   Everybody worked there, even the person he worked there and he

9   also used to get $300 a day.

10             THE COURT:  So nobody who hired you told you how

11   much they were going to pay you?

12             THE WITNESS:  Yes, we were told.

13             THE COURT:  By who?

14             THE WITNESS:  Puma Singh and Sasha.

15   BY MR. MARKOVSKI:

16   Q.   Do you have any knowledge of a company called PNS

17   Contracting New York Corp.?

18   A.   No.

19   Q.   Do you know who Mr. Puma Singh is?

20   A.   Yes, this person.

21   Q.   Were you brought to the job site by Mr. Puma Singh?

22   A.   Yes.

23   Q.   Have you ever done any work for PNS Contracting New York

24   Corp. for Mr. Puma Singh which is the principal of PNS

25   Contracting Corp.?

Devender Singh - Cross                    18

1           MR. SILVER:  Objection.  Testimony.  He's

2    identifying -- he's giving an opinion.

3           THE COURT:  Sustained to that extent.

4           Have you ever done any work for Mr. Puma Singh or a

5    company you believed him to own?

6           THE WITNESS:  No.

7    BY MR. MARKOVSKI:

8    Q.   There's an affidavit over here from Mr. Devender Singh

9    and it's all in English.  Was this statement made in front of

10   a translator?

11          MR. MARKOVSKI:  May I?

12          THE COURT:  Sure.

13          MR. MARKOVSKI:  Do you want to see it, Your Honor?

14          THE COURT:  I have it.

15          THE WITNESS:  I'm sorry.

16          THE COURT:  That's okay.  Do you want me to ask him

17   that?

18          MR. MARKOVSKI:  Please.

19          THE COURT:  So, Mr. Singh, are you familiar with the

20   fact that an affidavit was submitted on your behalf in

21   connection with your claim in this case?

22          THE WITNESS:  For a company?

23          THE COURT:  No.  Are you aware that your lawyer

24   filed a document that looks like an affidavit from you in

25   support of your claim in this case?

```
                    Devender Singh - Cross                    19
 1              THE WITNESS:  Yes.
 2              THE COURT:  I show you what's been filed as Document
 3    20-2.  Do you see the number at the top?
 4              THE WITNESS:  Yes.  Yes, Your Honor, yes.
 5              THE COURT:  On the third page, is that your
 6    signature?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Was this document translated into
 9    Punjabi for you before you signed it?
10              THE WITNESS:  Yes, and was notarized.
11              MR. MARKOVSKI:  May I ask who was the interpreter at
12    that time?
13              THE COURT:  Who was the interpreter is the question,
14    if you know.  Who was the interpreter?  Who translated it?
15              THE WITNESS:  Notary public and all the Punjabi guys
16    were there.
17              THE COURT:  Did anybody read you what the affidavit
18    said in Punjabi?
19              THE WITNESS:  No.
20              THE COURT:  How did you know what the affidavit said
21    before you signed it?
22              THE WITNESS:  Only I believe.
23              THE COURT:  Only I believe is the answer?  Who did
24    you believe?
25              THE WITNESS:  My lawyer.
```

```
              Devender Singh - Cross                    20
```

 1             THE COURT:  Did you know what you were signing?  Did

 2   you understand the words in English?

 3             THE WITNESS:  A little bit I understand.

 4             THE COURT:  You were able to understand it in

 5   English?

 6             THE WITNESS:  Yes, a little bit.

 7   BY MR. MARKOVSKI:

 8   Q.   Did you know enough to possibly ruin my reputation?

 9             THE COURT:  Sustained.  You don't have to answer

10   that question.

11             MR. MARKOVSKI:  I'm sorry, Your Honor.  I don't have

12   any further questions but I have a statement to make.

13             THE COURT:  Why don't you wait for all the

14   plaintiffs to testify and then you can make a statement about

15   all of them.  Okay?

16             MR. MARKOVSKI:  Thank you.

17             THE COURT:  That's the way we would usually do that.

18   The plaintiff would put on -- the plaintiffs would put on

19   their case and then you'd have an opportunity to speak as

20   well.

21             MR. MARKOVSKI:  Thank you.

22             THE COURT:  You're excused.  Next, Mr. Silver.

23             MR. MARKOVSKI:  Can I have this paper?

24             THE COURT:  That paper is now the court's.  Did you

25   make copies, Mr. Silver, or are these the only ones you got?

21

1          MR. SILVER:  Those are the originals.  I have

2  copies.

3          THE COURT:  Okay.

4          MR. MARKOVSKI:  Is it possible for me to get a copy?

5          THE COURT:  Yes.

6          MR. SILVER:  I have a copy for --

7          THE COURT:  Why don't you give it to him before you

8  examine the next defendant as well as -- the next plaintiff as

9  well as copies of any documents you intend to show the

10  plaintiff.

11          MALE VOICE:  May I get a glass of water?

12          THE COURT:  Yes, of course.

13                    [Pause in proceedings.]

14          MR. SILVER:  I'd call Jagjit Singh.

15          MR. MARKOVSKI:  Excuse me, Your Honor?

16          THE COURT:  Yes.

17          MR. MARKOVSKI:  Is this for Mr. Devender Singh?

18          THE COURT:  It's got the name written right up on

19  top, right?

20          MR. MARKOVSKI:  No.

21          THE COURT:  Okay.  Mine has --

22          MR. SILVER:  The handwritten has that.  This does

23  not.   I think that was -- the name was written on top

24  afterwards.

25          THE COURT:  I see.

```
                    Jagjit Singh - Direct                   22
1              MR. SILVER:  I think.
2              THE COURT:  Do you want to compare the two?
3                      [Pause in proceedings.]
4              THE COURT:  Stand up.  Raise your right hand.
5                  JAGJIT SINGH, PLAINTIFF, SWORN
6              THE COURT:  You may be seated.  Do you understand
7   what's being said after it's translated into Punjabi for you?
8              THE WITNESS:  Yes.
9              THE COURT:  State your name.
10             THE WITNESS:  Jagjit Singh.
11             THE COURT:  Thank you.  Go ahead, Mr. Silver.
12                      DIRECT EXAMINATION
13  BY MR. SILVER:
14  Q.   Mr. Singh, do you know Devender Singh?
15  A.   Yes.
16  Q.   Did you work with him?
17  A.   Yes.
18  Q.   You worked with him for Sunn Enterprises?
19  A.   Yes.
20  Q.   And Bogdan Markovski?
21  A.   Yes.
22  Q.   Did you work at the same locations he worked?
23  A.   Yes.
24  Q.   Did you work the same number of days that he worked?
25  A.   Yes.
```

Jagjit Singh - Direct                          23

1    Q.    Did you work on the same days that he worked?

2    A.    Yes.

3    Q.    Did you work on each of those days the same hours that he

4    worked?

5    A.    Yes.

6    Q.    Can you tell the court what those locations were?

7    A.    Parsons, Junction Boulevard -- Parson Boulevard, Brooklyn

8    29th, and the other one I don't remember the full address.

9    Q.    Do you know, was it in New York City?

10   A.    Yes.  Brooklyn.

11   Q.    The two locations in Brooklyn, what kind of location was

12   that?  What kind of building was that?

13   A.    In Flushing it was a church.  And the schools in the

14   Brooklyn.

15   Q.    What kind of work did you do at those locations?

16   A.    We did brick layer.  Brick layer works.

17              THE COURT:  Brick layer.  I didn't understand the

18   second word.

19              THE INTERPRETER:  Brick layer works.

20              THE COURT:  Works, okay.

21   Q.    Were you -- there was an agreement how much you were

22   going to be paid for each of those days worked.

23   A.    Yes.  It was $300 per day.

24   Q.    Per day.  Would that mean a regular day, like eight hours

25   work?

Jagjit Singh - Direct                    24

1   A.   Yes, eight hours.

2          THE COURT:  Who told you that?

3          THE WITNESS:  Sasha told and also there are other

4   persons -- persons there.

5          THE COURT:  Who is Sasha?

6          THE WITNESS:  Sasha was his partner.

7          THE COURT:  Pointing to the defendant, Mr.

8   Markovski?

9          THE WITNESS:  Yes.

10  BY MR. SILVER:

11  Q.   Were you among the gentlemen who went to New Jersey to

12  talk to somebody after you had not been paid?

13  A.   Yes.  Five, six people.  We all went to New Jersey.

14  Q.   So you were one of them?

15  A.   Yes.

16  Q.   Did you get paid anything for all the work that you did

17  that you just described?

18  A.   Nothing.

19          MR. SILVER:  May I just show the list, the exhibit I

20  marked to confirm that those were the dates?  Thank you.

21          THE COURT:  I'm putting before you what's been

22  marked as Plaintiff's DS-1.

23  Q.   Mr. Devender Singh just testified that those were the

24  dates and the --

25          THE COURT:  Well, just ask him -- you don't --

1   Q.   Are those the dates and the number of hours that you also

2   worked?

3   A.   Yes, I do work.

4           MR. SILVER:  I have nothing further.

5           THE COURT:  Would you like to ask this man some

6   questions?

7           MR. MARKOVSKI:  Sure.  What was the gentleman's

8   name?

9           THE COURT:  This is Jagjit Singh.

10                      CROSS-EXAMINATION

11  BY MR. MARKOVSKI:

12  Q.   Hello, Mr. Jagjit Singh.  I have the same question.  You

13  stated that you came to my office and you were hired directly

14  by me.

15          THE COURT:  But he didn't say that.  Did he?

16          MR. SILVER:  No, he did not.

17          THE COURT:  When did he say that, Mr. Markovski?

18  Q.   Were you ever hired by me personally to work at this

19  three particular jobs that you mentioned, Aberdeen Street,

20  29th Street in Brooklyn and Parsons Boulevard in Flushing?

21  A.   Sasha hired me.

22  Q.   Do you have the same sign in sheets that I knew were

23  probably done by yourself just like Mr. Devender Singh or no?

24          MR. SILVER:  Objection.

25          THE COURT:  Overruled.

Jagjit Singh - Cross                          26

1   A.   I didn't [inaudible] anything separate.  We used to work

2   together so whatever he did we discussed to do it together.

3   Same page.

4   Q.   Was there any formal sign in sheets from any company that

5   were being signed on the job site?

6   A.   No, there's no such thing.  Some people just signed and

7   some people --

8   Q.   The some people that you're referring to, are those some

9   people present here?

10  A.   I don't know.  They didn't sign in front of me.

11          THE COURT:  One witness.  One at a time.  You will

12  all have your turn.

13  Q.   May I ask what sign in sheets were those?

14          MR. SILVER:  I'm sorry.  Who's he asking it to?

15          THE COURT:  He's asking the witness.  If he's not --

16          MR. SILVER:  He's looking at them and I'm wondering

17  who he was asking.

18          THE COURT:  Do you remember there being some kind of

19  a sign in sheet on the job site?

20          MALE VOICE:  [Inaudible].

21          THE COURT:  I'm going to send them out of the room.

22  No talking.  No hand raising.  No nothing.

23          THE WITNESS:  Yes, one person he signed.

24  BY MR. MARKOVSKI:

25  Q.   Would you know if that one person signed for everybody or

Jagjit Singh - Cross                       27

1   just for him?

2   A.   I don't know that he signed but he signed for him or all

3   people.  I don't know.  I didn't sign.

4   Q.   But for his personal hours he was relying on somebody

5   else to sign their name for him and he's working his hours?

6            MR. SILVER:  Objection.

7            THE COURT:  Sustained.  You can ask that witness

8   when he testifies or you can call him as a witness if you want

9   to.  You can ask this question -- this witness about his hours

10  and his sign ins.  This is Prabhjit Singh -- Jagjit Singh.

11           MR. MARKOVSKI:  Say that again, Your Honor.

12           THE COURT:  Jagjit, J-A-G-J-I-T.  You can ask him

13  about what he did and you can ask him what he saw other people

14  do but you can't ask him what other people had in their mind.

15  He wouldn't know that.

16           MR. MARKOVSKI:  He stated that he seen somebody sign

17  for everybody.

18           THE COURT:  Yes, you can ask him about that but then

19  you said was he signing for himself or for other people.

20           MR. MARKOVSKI:  No, I'm not saying that.  The paper

21  was presented from Mr. Devender Singh he stated that he was

22  not writing his hours.  He was depending upon what Mr.

23  Devender Singh signed.

24           THE COURT:  Yes, that's what I understood him to say

25  as well.

```
                    Jagjit Singh - Cross                   28
```

1   BY MR. MARKOVSKI:

2   Q.   Are you aware of a company called PNS Contracting New

3   York Corp.?

4   A.   No.

5   Q.   Have you ever done any work for this particular company?

6   A.   No.

7           MR. MARKOVSKI:  No further questions, Your Honor.

8           THE COURT:  Anything else?

9           MR. SILVER:  Nothing further.

10          THE COURT:  You can step down.  Next witness.

11          MR. SILVER:  Baljinder Singh.

12          THE COURT:  Baljinder Singh, come forward.  Be

13  sworn.

14              BALJINDER SING, PLAINTIFF, SWORN

15          THE COURT:  Mr. Singh, do you understand English?

16          THE WITNESS:  Not much.

17          THE COURT:  Do you understand the Punjabi

18  interpreter?

19          THE WITNESS:  Yes.

20          THE COURT:  You may inquire.

21          MR. SILVER:  Thank you, Your Honor.

22                    DIRECT EXAMINATION

23  BY MR. SILVER:

24  Q.   Mr. Singh, do you know Mr. Devender Singh and Jagjit

25  Singh?

```
                    Baljinder Singh - Direct                    29
 1  A.    Yes.
 2  Q.    Did you work with them?
 3  A.    Yes.
 4  Q.    For Sunn Enterprises?
 5  A.    Yes.
 6  Q.    Did you work at the same location as they worked?
 7  A.    Yes.
 8  Q.    Did you work on the same days that they worked?
 9  A.    Yes.
10  Q.    On each of those days did you work the same number of
11  hours they worked?
12  A.    Yes.
13  Q.    What kind of work did you do?
14  A.    Brick work and grinding and pointing.
15           THE COURT:  What's the second word?
16           THE INTERPRETER:  Grinding and pointing I think.
17  Grinding --
18           THE COURT:  Grinding and pointing.  Those are
19  English words, right?
20           THE WITNESS:  Yes, in this word.
21  Q.    Did you -- were you going to be paid for that work?
22  A.    I didn't get.
23  Q.    Oh, no.  But you were supposed to be paid for that work;
24  is that correct?
25  A.    Yes.
```

```
                    Baljinder Singh - Cross                    30
```

1   Q.   How much were you supposed to be paid?

2   A.   300.

3   Q.   That was for one day's work?

4   A.   Yes.

5   Q.   Eight hours a day?

6   A.   Yes.

7              THE COURT:  Who told you that?

8              THE WITNESS:  Sasha.

9              MR. SILVER:  Okay.  Nothing further.

10             THE COURT:  Any questions?

11             MR. MARKOVSKI:  Yes, Your Honor.

12                         CROSS-EXAMINATION

13  BY MR. MARKOVSKI:

14  Q.   Mr. Singh, would you ever hired directly by me to perform

15  work at the following address, 2 Aberdeen Street in Brooklyn,

16  29th Street in Brooklyn and Parsons Boulevard, Flushing?

17  A.   Sasha hired.

18  Q.   Did I ever personally tell you how much you were going to

19  get paid per day?

20  A.   Sasha told $300.

21  Q.   I'm looking at an affidavit by Mr. Baljinder Singh and I

22  would like to ask if this was signed with an interpreter

23  present and if he understood what he was signing at that time.

24             THE COURT:  I show you an affidavit that was filed

25  as part of Docket Entry 20-2.  Is that your signature on the

```
                    Baljinder Singh - Cross                    31
```

1  third page?

2          THE WITNESS:  Yes.

3          THE COURT:  Before you signed it, was it translated

4  for you?

5          THE WITNESS:  Yes.

6          THE COURT:  Who translated it?

7          THE WITNESS:  My friend.

8          THE COURT:  Your friend speaks English?

9          THE WITNESS:  Yes.

10          THE COURT:  What's your friend's name?

11          THE WITNESS:  Harmangat.

12          THE COURT:  Spell it, please.

13          THE WITNESS:  H-A-R-M-A-N-G-A-T.

14  BY MR. MARKOVSKI:

15  Q.   Did you ever perform any work by a company called PNS

16  Contracting New York Corp.?

17  A.   No.

18  Q.   Have you ever heard of such a company?

19  A.   No.

20          MR. MARKOVSKI:  Nothing further, Your Honor.

21          THE COURT:  Anything?

22          MR. SILVER:  No.

23          THE COURT:  You may step down.  Next.  Who's coming

24  next?

25          MR. SILVER:  Puma Singh, please.

Puma Singh - Direct                          32

1          THE COURT:  Puma Singh, come forward.  Be sworn.

2                PUMA SINGH, PLAINTIFF, SWORN

3          THE COURT:  Are you able to understand the Punjabi

4     translation?

5          THE WITNESS:  Yes.

6          THE COURT:  You may inquire.

7          MR. SILVER:  Thank you.

8                    DIRECT EXAMINATION

9     BY MR. SILVER:

10    Q.   Mr. Singh, do you know Devender Singh, Jagjit Singh,

11    Baljinder Singh?

12    A.   Yes.

13    Q.   Did you work with them at the same locations?

14    A.   Yes.

15    Q.   You worked -- did you work in any locations in Brooklyn?

16    A.   29 Aberdeen Street and 29th Street and Flushing.

17    Q.   What kind of buildings were those?

18    A.   In Brooklyn schools.  Flushing, church.

19    Q.   What kind of work did you do there?

20    A.   Brick work, stone work and metal change.

21          THE COURT:  Metal change, C-H-A-N-G-E or chain, C-H-

22    A-I-N?

23          THE INTERPRETER:  To change, C-H-A-N-G-E.

24          THE COURT:  You've been saying school and something

25    else.

```
                    Puma Singh - Direct                    33
```

1          THE INTERPRETER:  Church.

2          THE COURT:  Church, C-H-U-R-C-H, is that the word

3   you're translating?

4          THE INTERPRETER:  C-H-U-R-C-H, yes.

5   BY MR. SILVER:

6   Q.    The church was at the Queens location?

7   A.    Yes.

8   Q.    In front of you is a document that Devender Singh

9   identified as the list of the dates that he worked, the hours

10  that he worked on each of those dates.

11  A.    Yes, we did the same hours, same day.

12  Q.    Did you make your own set of papers or Devender Singh --

13         MR. SILVER:  Let me withdraw that question.

14  Q.    Were you supposed to be paid on a daily basis for a day's

15  work?

16  A.    Yes.

17  Q.    How much were you supposed to be paid?

18  A.    $300 per day.

19  Q.    Who told you that?

20  A.    Sasha.

21         THE COURT:  Do you know how to spell Sasha?

22         THE WITNESS:  I only know Sasha.  Everybody calls

23  him Sasha.

24         THE COURT:  Do you know how he spells that or you

25  don't know?

                    Puma Singh - Direct                    34

1              THE WITNESS:  I don't know.

2              THE COURT:  You don't have his full name?

3              THE WITNESS:  I don't know the full name.

4              THE COURT:  How did -- other people -- did you hear

5    other people say that Sasha was Mr. Markovski's partner?

6              THE WITNESS:  Yes, I went to his office with Mr.

7    Markovski in New Jersey, same office.

8              THE COURT:  Same off -- say that again.  Whose

9    office did you go to?

10             THE WITNESS:  His.

11             THE COURT:  Meaning Mr. Markovski?

12             THE WITNESS:  Yes.

13             THE COURT:  And Sasha was there?

14             THE WITNESS:  Yes.

15             THE COURT:  And he sat with Mr. Markovski like you

16   worked together with him?

17             THE WITNESS:  Yes.

18   BY MR. SILVER:

19   Q.   Did they explain to you why they were not paying you?

20   A.   They told me that the other company didn't pay us.

21   That's why they couldn't pay.

22             THE COURT:  Who told you that, Sasha or Mr.

23   Markovski or both?

24             THE WITNESS:  This person.

25             THE COURT:  Markovski.  Pointing to the defendant

```
                    Puma Singh - Direct                    35
```

1  Markovski.  Go ahead.

2  BY MR. SILVER:

3  Q.   Just to clarify.  You weren't paid at all?

4  A.   No.

5  Q.   Were there -- all together how many people were working

6  at these locations?

7  A.   About 16 to 17.

8  Q.   There were some people who were paid?

9  A.   Yes, some money.

10  Q.   Can you explain what you know about that?

11       THE COURT:  What are you looking at?

12  **(Microphones not working properly at this point.)**

13       THE WITNESS:  He gave me two checks in the name of

14  my wife's company.  I paid the seven people that money.

15  Q.   You say the seven people that money, do you mean any of

16  these people?

17  A.   No, not in this group.  Another seven people.

18       THE COURT:  When you said he gave you two checks,

19  Mr. Markovski, and your wife was a company?

20       THE WITNESS:  My wife a company.

21       THE COURT:  What's it called?

22       THE WITNESS: PNS.

23       THE COURT:  And he gave you checks made out to PNS?

24       THE WITNESS:  Yes.

25       THE COURT:  And he told you to pay seven other

                    Puma Singh - Direct                    36

1   people with the money?

2           THE WITNESS:  Yes, seven people and also two Spanish

3   I paid them cash.

4           THE COURT:  Two what?

5           MR. SILVER:  Spanish I think.

6           THE WITNESS:  Spanish.

7   BY MR. SILVER:

8   Q.   So those people were paid what they -- for the work that

9   they did; is that correct?

10  A.   Yes.

11  Q.   But none of that money that you talked about went to any

12  of these people including yourself?

13  A.   No.

14          MR. SILVER:  Nothing further.

15          MR. MARKOVSKI:  Your Honor, can we see, please, what

16  he was looking at, [inaudible] checks?

17          THE COURT:  Absolutely.  Bring out the paper.

18                  [Pause in proceedings.]

19          MR. SILVER:  I'm sorry.  Is there something being

20  said that I shouldn't hear?

21          THE COURT:  Yes.  He asked me if I read it.  I said

22  no.

23          MR. MARKOVSKI:  Can we read it, please, out loud?

24          MR. SILVER:  I would object.

25          THE COURT:  You do or you don't?

1          MR. SILVER:  I do.

2          THE COURT:  On what grounds?  Your client referred

3  to --

4          MR. SILVER:  [Inaudible]

5          THE COURT:  But your client referred to it during

6  his testimony.  We'll mark it as Court Exhibit 1.  The witness

7  pulled it out of his pocket.  Go have a seat everybody.  The

8  witness pulled it out of his pocket and looked at it during

9  his testimony.  We'll make copies after it's marked.

10                    (Court Exhibit 1, Marked.)

11         THE COURT:  It refers to work performed at three

12 locations by PNS Contracting at a price of $110,000 and it

13 says "It his statement is to serve as confirmation of work

14 performed by PNS Contracting New York Corp.  It is to assist

15 in the efforts of Z Barclay Group with egregious demands for

16 monies due made by Sunn Enterprises."  It describes work done

17 at the three locations we've been discussing by PNS

18 Contracting in agreement with Sunn Enterprises and it

19 acknowledges the receipt of four payments totalling $52,500 if

20 my arithmetic is correct.  One of which is -- some of which is

21 for material.  Oh, it's three payments.  Excuse me.  For 32.5.

22 But then there's a cross out that says $20,000, not $32,500.

23 So I'm not sure what the significance is but that's the

24 document and now it's in evidence.

25         We'll make copies if you'll remind me, Mr. Silver,

Puma Singh - Cross                               38

1  so your client can have one to take home.  Any other

2  questions?

3              MR. MARKOVSKI:  Yes.

4              THE COURT:  Go ahead.

5                       CROSS-EXAMINATION

6  BY MR. MARKOVSKI:

7  Q.    Mr. Puma Singh, were you hired for these particular jobs

8  2 Aberdeen Street in Brooklyn, 29th Street in Brooklyn and

9  4602 Parsons Boulevard in Flushing directly by me?

10 A.    Yes, he did -- you did.

11 Q.    Did you come to my office and ask me for work and I said

12 yes, Mr. Puma Singh, I have work at three job sites and you're

13 going to be paid $300 a day for your services?

14 A.    Sasha told me that everybody will get $300 a day for work

15 for eight hours a day.

16 Q.    But those words did not come from my mouth; correct?

17 A.    He came to the job location two times --

18              THE COURT:  He meaning this man here?

19              THE WITNESS:  Yeah.

20 A.    Sasha also with him and Sasha told that all of you will

21 get paid $300 a day for eight hours a day.

22 Q.    But I have never said those words, correct, Sasha did?

23 A.    Sasha was there present like you and me.  Present like

24 next to each other and Sasha told us on the job you will

25 get -- you will be getting paid $300 per day, eight hours.

Puma Singh - Cross                          39

1   Q.    So does that mean I have never said that; correct?

2   A.    Sasha told us.

3   Q.    So under oath he changes -- okay.  You stated that PNS

4   Contracting New York Corp. is your wife's company?

5   A.    Yes.

6   Q.    Did TNS Contracting New York Corp. perform any work at

7   these three particular job sites?

8   A.    Yes.  Your company did the work and your company issued

9   the check of -- in my wife's company's name and told her,

10  instructed her to pay some money to the seven person and

11  [inaudible] who we paid that money.

12  Q.    So my company did the work on these three job sites?

13  A.    These people -- yes, your company.

14  Q.    Why would Sunn Enterprise Group pay PNS Contracting if

15  Sunn Enterprise performed the work?

16        MR. SILVER:  I'm going to object to that question.

17  He's going to figure out why Sunn Enterprise did something?

18        THE COURT:  Did Mr Markovski or anyone else tell you

19  why Sunn Enterprises wanted to pay workers for this work

20  through your wife's company?

21        THE WITNESS:  He told me that I want you to pay some

22  of the people with the money since I had no company.  So he

23  said just take -- you can get the check to your wife's company

24  and we will pay the tax for your wife's company.  So we took

25  it.

Puma Singh - Cross                    40

1   BY MR. MARKOVSKI:

2   Q.   The workers that you paid the alleged money back that

3   came from PNS and that you paid them, do you have their hours?

4   A.   I don't have right now but I paid them accordingly $300

5   per day.

6   Q.   How long did they work over there for and if he knows the

7   total number of hours worked that those guys that were paid

8   only?

9   A.   Yes.  I don't have right now with me but if you want when

10  I go home I can find out and give it to you that number of

11  hours and number of days they worked and I paid.

12  Q.   Do you have your own sign in sheets from the job sites

13  that you were keeping the hours worked?

14          MR. SILVER:  I'm going to object to the use of the

15  word yours.  There's no connection this gentleman at this

16  point has to a company that his wife owns.

17          THE COURT:  I understood the question differently.

18          Do you have any sign in sheets that you signed to

19  reflect the hours that you worked?

20          THE WITNESS:  I worked for 53 and a half days.

21          THE COURT:  Sir, the question is do you have any

22  sheets of paper that you signed reflecting your hours of work.

23          THE WITNESS:  We all work together, Sammy, Devender,

24  everybody, and we do brick works, grinding, stone work and we

25  have the paper, same one.

Puma Singh - Cross                                   41

1              THE COURT:  Do you have any other papers of your

2    own?

3              THE WITNESS:  No.

4              THE COURT:  Did you sign any other sign in sheets on

5    the job site for anybody else?

6              THE INTERPRETER:  Can you repeat the question again,

7    please?

8              THE COURT:  Yes.  When you were on the job site did

9    you sign any sign in forms for the employer?

10             THE WITNESS:  No, I didn't.

11   BY MR. MARKOVSKI:

12   Q.   Do you know if somebody else from [inaudible] or the

13   people present over here signed any other sheets?

14             THE COURT:  All right.  They're out.  Wait outside.

15   Everybody waits outside.  You keep interrupting the witnesses

16   by raising your hands, by saying things.  That's it.  I gave

17   you a warning.  Tell your clients to wait outside.  You'll go

18   and get them when it's their turn to testify.

19             MR. MARKOVSKI:  Just one question, please, before

20   they leave.  Obviously they know whose sign in sheets they

21   were signing.  Before they leave if they can just say a

22   company or place before they leave.

23             MR. SILVER:  They're not going anywhere other than

24   waiting outside.

25             THE COURT:  Yes.  They're all going to testify.

Puma Singh - Cross                42

1          MR. MARKOVSKI:  Okay.

2          THE COURT:  Yes.  I don't want them influencing each

3    other's testimony.

4          MR. MARKOVSKI:  But the first gentlemen, Devender

5    Singh, he raised his hand saying that --

6          THE COURT:  You can call him back.

7          MR. MARKOVSKI:  Okay.

8          THE COURT:  Wait outside.  I'm tired of the

9    interruptions.

10   (Potential witnesses excused from courtroom.)

11         THE COURT:  We're going to be going a long time.

12   Late.  Sit.

13         Do you know if anybody else signed papers when --

14   signed in or signed out on the job site?

15         THE WITNESS:  His partner and supervisor used to

16   sign two, three different sheets of paper at the job location.

17         THE COURT:  Is that the man Sasha you referred to or

18   somebody else?

19         THE WITNESS:  The one person named Demetria and

20   Sasha.  Both.

21         THE COURT:  Do you know if any of the other

22   plaintiffs, the people you came here with, ever signed their

23   own time sheets or kept records of the time that they worked?

24         THE WITNESS:  Yes.  They used to bring their own

25   company papers and they used to get signed sometimes.

Puma Singh - Cross                    43

1        THE COURT:  Who did that?

2        THE WITNESS:  Demetria and Sasha.

3        THE COURT:  Did any of the other plaintiffs, the

4   people who you are suing with, the people who are in the jury

5   box, those people, did any of them other than Devender Singh

6   sign time sheets or keep records of their own time?

7        THE WITNESS:  Yes, there are the three job locations

8   and the location I used to work that they used to get signed a

9   couple of peoples in their company did.  In other locations

10  and they're [inaudible], the peoples, the other location where

11  they get them signed and that location I don't know.

12       THE COURT:  Okay.  I'm not understanding you at all.

13  So please try to translate as precisely as possible.

14       MR. SILVER:  Your Honor, may I simply suggest that

15  you -- there are time sheets and sign in, that we can do one

16  and then the other?

17       THE COURT:  Sure.  Did any of the other plaintiffs,

18  the people who were just sitting here keep their own records

19  of the time that they worked on these three job sites?

20       THE WITNESS:  Yes, they had.

21       THE COURT:  Which ones?

22       THE WITNESS:  Yes, everybody knew and they have

23  their own record that how many hours and how many days they

24  work.

25       THE COURT:  Did you keep a record of the hours that

Puma Singh - Cross                    44

1  you worked?

2          THE WITNESS:  Four people used to work together with

3  brick work and grinding.  Four people, same location, same

4  job, same hour.  We used to have one record for all four.

5          THE COURT:  You think that all of the others had

6  their own records?

7          THE WITNESS:  Yes.

8          THE COURT:  On the three jobs, did Demetria and Sash

9  ask the workers to sign time sheets for the company?

10          THE WITNESS:  Yes.

11          THE COURT:  Did you sign some of those time sheets

12  yourself?

13          THE WITNESS:  Yes, I did.

14          THE COURT:  Do you believe the others did also?

15          THE WITNESS:  Six people they worked with me in the

16  one location I don't they had but the other location or other

17  people what they did I have no --

18          THE COURT:  Which location were you at?

19          THE WITNESS:  I did in Flushing and Aberdeen Street.

20          MR. MARKOVSKI:  Your Honor --

21          THE COURT:  Go ahead.

22          MR. MARKOVSKI:  -- some of those statements that he

23  made he keeps contradicting himself.  He's alleging that he

24  worked at all three job sites.  He just said that he was

25  present on only two.

Puma Singh - Cross                         45

1              MR. SILVER:  Objection.

2              THE COURT:  You can ask him questions and when all

3    the evidence is over you can argue whatever points you want to

4    make.  If you have questions for him you can ask him.  First

5    we collect the evidence and then I hear from Mr. Silver and

6    then I hear from you.

7    BY MR. MARKOVSKI:

8    Q.   Do you recall the name on those sign in sheets, the

9    company name?

10             THE COURT:  The company name.

11   A.   Yes, there was Sunn Enterprises like that on the sheet.

12   Q.   Do you know of a company named Z Barclay?

13   A.   Another person used to come at the job location.  I think

14   he had that company.  That company names -- that person name

15   was Dino.  That person might be with that company.

16   Q.   Might be or you know for sure?

17   A.   Yes, I went to his office also in Long Island.  I know

18   that.

19   Q.   Is that where you obtained the paper that you showed us

20   previously?

21             THE COURT:  Could you ask that again?  I didn't

22   understand.

23             MR. MARKOVSKI:  Is that where he obtained the paper

24   that he pulled out of his pocket.

25             THE COURT:  From Dino at Z Barclay's Long Island

Puma Singh - Cross                              46

1  office?

2           MR. MARKOVSKI:  Uh-huh.  Is that where the paper

3  came from.

4           THE COURT:  Who gave you the paper that you showed

5  us before that's been marked as Court Exhibit 1?  Who gave you

6  this?

7           THE WITNESS:  Mr. Dean.

8           THE COURT:  He gave it to you at his office in Long

9  Island?

10          THE WITNESS:  The Long Island office.

11          THE COURT:  Thank you.

12 BY MR. MARKOVSKI:

13 Q.   Do you know of a company named Flag Waterproofing and

14 Restoration?

15 A.   At first I didn't know but when I came to his office then

16 we found out that company.

17 Q.   Whose office?

18 A.   Your office.

19 Q.   My office.  Is it possible that some of the sign in

20 sheets that you were signing were either of Z Barclay's or

21 Flag's sign in sheets?

22          MR. SILVER:  Objection.  He's already testified what

23 it said.

24          THE COURT:  Overruled.

25 A.   No.  Only Sunn, your company.

Puma Singh - Cross                    47

1  Q.   Would you happen to have some of the sign in sheets under

2  Sunn Enterprise Group?

3  A.   No.  Your supervisor used to collect those papers and you

4  used to keep those papers.

5  Q.   Did you ever request from Sunn Enterprise's office those

6  sign in sheets?

7  A.   No, I didn't.

8  Q.   Was there a particular reason you went to Z Barclay's

9  office?

10 A.   Because when your company didn't pay any of our worker

11 then I went to that office to find out if they can pay.  So

12 they told us, that office told us no, we are not going to pay.

13 Your company is supposed to pay.

14 Q.   Did he go to Z Barclay's office representing PNS

15 Contracting New York Corp.?

16 A.   Yes, I told them that I got three checks from your

17 company and that to pay seven peoples.  Then other people ask

18 me who pay our checks.  So that company told us your company

19 is supposed to pay all of our checks.

20 Q.   So you told Z Barclay that you had a subcontract

21 agreement with Sunn Enterprise under PNS Contracting Corp.?

22         MR. SILVER:  Objection.

23         THE COURT:  Overruled.  Did -- overruled.

24 A.   No, there's no such -- no such finding.

25 Q.   Why would Sunn Enterprise make those checks of $32,500 to

Puma Singh - Cross                    48

1  PNS Contracting Corp. for this particular project?

2          THE COURT:  I think we already asked that question.

3          MR. MARKOVSKI:  Okay.

4  Q.  Does he have -- do you have a copy of the checks?

5  A.  No, the paper is written the check number and the amount.

6  Q.  I'm interested in particular in the memo of the checks.

7          THE COURT:  Do you have the checks?  He's asking.

8          THE WITNESS:  Yes, could be.  It's possible.

9          MR. MARKOVSKI:  May I present the checks?

10         THE COURT:  Sure. You can show them to him.  Ask him

11 if he recognizes them.

12         MR. SILVER:  May I see them?

13         THE COURT:  You have to show them to Mr. Silver

14 first.

15         MR. SILVER:  This is something else, right?

16         MR. MARKOVSKI:  I was not able to obtain the actual

17 check that he signed but that's the stub that was left over in

18 the book.

19         MR. SILVER:  They're -- Your Honor, there are two

20 checks.  There is an entry which is probably from the

21 checkbook but --

22         THE COURT:  Okay.

23         MR. SILVER:  -- then there's another document.

24         MR. MARKOVSKI:  With the same check number as the

25 statement.

Puma Singh - Cross                    49

1          MR. SILVER:  I'm making a statement to Your Honor at

2  this point.  There's another document which is the general

3  liability release.

4          THE COURT:  Okay.

5          MR. SILVER:  Those are separate things than the

6  check but --

7          THE COURT:  They certainly are but if the examiner

8  wants to show them to the witness I'll let him.

9          MR. MARKOVSKI:  Thank you.  Would you like to see

10  them as well, Your Honor?

11          THE COURT:  No.  I'll look over the witness's

12  shoulder.

13  BY MR. MARKOVSKI:

14  Q.   Are you familiar with these checks?

15          THE COURT:  Showing the witness checks that appear

16  to be drawn on Sunn Enterprise Group, LLC No. 1379 and 1344.

17                    [Pause in proceedings.]

18  A.   This two check and the paper for record and this is

19  [inaudible].  I [inaudible] over there --

20          THE COURT:  So in English the witness said that 1344

21  and a stub for -- let me see the document under it.  A stub

22  for 1250 represent two checks or a check and a stub

23  representing a check that he used to pay workers and that

24  check 1379 for 2,500 he used for materials.  Correct?

25          THE WITNESS:  Yes.  He went to job site.  He said do

Puma Singh - Cross                    50

1    something.  Maybe you bring like a glasses, mask and cement

2    like that.

3              THE COURT:  And cement.  When you say he said, who,

4    Mr. Markovski, the man standing in front of you?

5              THE WITNESS:  Yeah.

6              THE COURT:  Do you have other questions about the

7    documents?

8              MR. MARKOVSKI:  We have a time and -- for him as

9    well saying that --

10             THE COURT:  You can ask him about it or you can just

11   rely on the document itself.  Whatever you want to do.

12   BY MR. MARKOVSKI:

13   Q.   You have a paper signed over here for 29th Street in

14   Brooklyn that you have been paid in full for this particular

15   job site with this check.

16             THE COURT:  That's not a question.  That's a

17   statement.  He's a witness.  You can ask him a question if you

18   want to ask him a question.

19   Q.   Are you aware that this check was given to you to satisfy

20   your balance on 1340 East 29th Street?

21             THE INTERPRETER:  Give me that address again.  29th

22   Street?

23             MR. MARKOVSKI:  Yes.  East 29th Street in Brooklyn.

24   A.   No.

25             THE COURT:  Do you wish to offer those as exhibits

1   at this hearing?

2            MR. MARKOVSKI:  Please.

3            THE COURT:  Defendant's 1, 2 and 3.

4            (Defendant's Exhibits 1, 2 and 3, Marked.)

5   Q.   The money -- Mr. Singh, the money that was given to PNS

6   Contracting Corp. by Sunn Enterprise Group some of that money

7   you said that went to pay workers; correct?

8   A.   Seven people.

9   Q.   Were those workers employed by Sunn Enterprise Group or

10  PNS Contracting Group?

11  A.   For your company.

12           THE COURT:  Who decided which workers would be paid

13  and how much?

14           THE WITNESS:  Sasha told me that.

15  Q.   If those workers that were paid were employed by Sunn

16  Enterprise Group, why would PNS Contracting Corp. pay them?

17           MR. SILVER:  Objection.

18           THE COURT:  Overruled.

19           MR. SILVER:  The answer was just given.

20           THE COURT:  This is about why he -- did you -- did

21  you make the payments to these seven people?

22           THE WITNESS:  Yes, from that check.

23           THE COURT:  Why would you be paying people if they

24  were working for Mr. Markovski's company?

25           THE WITNESS:  He requested me that since you or your

Puma Singh - Redirect                                        52

1   wife has a company why don't you let me pay some check to the

2   company.  I would pay the taxes also for the company and from

3   that company where he was paying you the check and you give --

4   distribute the money from that check to those seven people.

5            THE COURT:  Did you have any understanding why Sunn

6   didn't want to pay its employees directly?

7            THE WITNESS:  Yes.  I don't know that but Sasha

8   requested to me that I give you your wife's company name a

9   check.  You keep some of the money, salary of those seven

10  people from that check and he told me that we'll pay the taxes

11  of your wife's company also.

12           THE COURT:  Okay.  Mr. Markovski, anything else?

13           MR. MARKOVSKI:  No further, Your Honor.

14           THE COURT:  Mr. Silver.

15           MR. SILVER:  Just a couple of questions.

16                       REDIRECT EXAMINATION

17  BY MR. SILVER:

18  Q.   So these were people who were workers for Mr. Markovski's

19  company?

20  A.   Yes.  All of us.

21  Q.   And in receiving the money and making payments to these

22  people you were following the directions that Sasha gave you?

23  A.   Yes, I am.

24  Q.   But did your wife's company do work there or they just

25  received the check?

Puma Singh - Recross                     53

1   A.   No, only take -- [inaudible] questioned me to help me to

2   distribute the check from that -- distribute the money from

3   that check.

4   Q.   Just to get a definite answer.  Did your -- the work that

5   was being done at that location, was it being done in part by

6   your wife's company or only by Sunn Enterprises?

7   A.   Not my wife's company.

8              MR. SILVER:  Okay.

9              MR. MARKOVSKI:  I have a question, Your Honor.

10                        RECROSS EXAMINATION

11  BY MR. MARKOVSKI:

12  Q.   Besides these three jobs, has PNS Contracting ever done

13  work for Sunn Enterprise Group?

14  A.   For your company?

15             THE COURT:  Yes.

16  Q.   Yes.

17  A.   No, I don't know.

18  Q.   So you're saying that PNS Contracting Corp. has never

19  done any work for Sunn Enterprise Group aside from these three

20  jobs?

21             THE COURT:  Wait, wait, wait, wait.  That question

22  is not what you asked.  You said putting aside these three

23  jobs --

24             MR. MARKOVSKI:  Correct.  Has PNS Contracting done

25  any work for Sunn Enterprise Group.

Puma Singh - Recross                          54

1          THE COURT:  PNS, have they ever done any work at any

2   time at any location for Sunn Enterprises.

3          MR. MARKOVSKI:  Or has received any checks besides

4   these three projects on other projects through PNS Contracting

5   Group.

6          THE COURT:  Do you understand the question?

7          THE INTERPRETER:  Yes.

8   A.   No, I don't.  Maybe you have to ask my wife.

9   Q.   I'm sure that if PNS did any work for Sunn Enterprise

10  Group in the past your wife would have told you if there was a

11  balance just like she brought it up over here; correct?

12         MR. SILVER:  Objection.

13         THE COURT:  Sustained.  Did your wife tell you that

14  Sunn Enterprises owed PSNY money for any of these three jobs?

15         THE WITNESS:  No.

16         THE COURT:  Did she ever tell you that Sunn

17  Enterprises had done any business with PSNY?

18         THE WITNESS:  I had two company.  One is in my name

19  and other one is in my wife's name.  So one time in New Jersey

20  I work with this company, their company with my company Gemini

21  Construction in New Jersey.

22         MR. SILVER:  What is the name of the company?  I'm

23  sorry.

24         THE COURT:  Gemini.  But other than that, neither

25  Gemini nor PSNY have ever done any work with Sunn except for

```
                  Puma Singh - Recross                    55
```

1    the one job in New Jersey?

2              THE WITNESS:  Only one job in New Jersey.

3              THE COURT:  Do you remember the address?

4              THE WITNESS:  There's a school or college.

5    BY MR. MARKOVSKI:

6    Q.   Were you paid by a check from Sunn Enterprise Group?

7    A.   I don't remember exactly whether the Sunn Enterprise

8    Company issued a check to my company or to my wife's company

9    for --

10   Q.   Whoa.  Were the workers on that particular job site in

11   New Jersey that you're referring to paid?

12             THE COURT:  Were the workers on that job site paid?

13             THE WITNESS:  Yes.

14             THE COURT:  By who?

15             THE WITNESS:  That was two years ago.  So whatever

16   the check was paid that it was paid to the worker.

17             THE COURT:  Did the work for your company, the

18   workers on that job, or did they work for Sunn?

19             THE WITNESS:  Those workers used to know me.  So --

20   in New Jersey.  So he paid with a check to my company.  So I

21   paid them that salary in full two years ago.

22   BY MR. MARKOVSKI:

23   Q.   Do the standard practices that you practiced with Sunn

24   Enterprise or other contractors, the contractor pays and then

25   you pay the workers?

Puma Singh - Recross                    56

1   A.    They're two different things.   In New Jersey that was my

2   people.   So I introduced Sunn Enterprise for the work.   So

3   Sunn Enterprise paid with a check and I paid the -- all the

4   worker in that location in full but this time this location

5   was directly hired by Sunn Enterprise and Sunn Enterprise

6   asked me to help, to pay the check to my wife's company so

7   that my wife's company can pay some of the salary to some of

8   the workers.   Seven workers.

9              MR. MARKOVSKI:   I [inaudible].

10             THE COURT:   Okay.

11                    [Pause in proceedings.]

12  **(Audio garbled starting at this point.)**

13  BY MR. MARKOVSKI:

14  Q.    Do you recall this piece of paper?   Why was this paper

15  supplied to Sunn Enterprise's office?

16  A.    To be -- yes, I remember.   He tell me you give

17  [inaudible], I give two check -- two checks we pay for so I

18  pay the tax too.

19             THE COURT:   What?   Say that again.

20             THE WITNESS:   The three workers that worked in

21  Brooklyn and Flushing their company asked me do you have any

22  company.   If you have any company give the insurance papers

23  and all the papers then we will pay the tax and you -- we pay

24  the check.   You give it to the seven workers.

25  Q.    Then he was going to pay the tax?

Puma Singh - Recross                    57

1   A.   No.   You.

2   Q.   But [inaudible] that he started you said that he was

3   going to pay the taxes.

4   A.   [Inaudible]

5            THE COURT:  Whoa, whoa, whoa.  We're going through

6   the interpreter.  Who was going to pay the taxes?

7            THE WITNESS:  He told me that he will pay the tax.

8   You help me to pay the seven workers and I did.

9            THE COURT:  The certificate of insurance we'll mark

10  as Defendant's 4.  That's the document we've just been looking

11  at.

12               (Defendant's Exhibit 4, Marked.)

13           THE COURT:  What's next?

14           MR. SILVER:  Your Honor, may I just examine this in

15  the meantime, this document?

16           THE COURT:  Yes.

17                  [Pause in proceedings.]

18  BY MR. MARKOVSKI:

19  Q.   The affidavit that you signed, was the affidavit signed

20  in front of an interpreter and were you aware of the content

21  of the affidavit?

22  A.   No.

23           THE COURT:  No, what?

24           THE WITNESS:  Different timing.

25           THE COURT:  No interpreter?

Puma Singh - Recross                           58

1            THE WITNESS:  No interpreter.

2            THE COURT:  You read it in English?

3            THE WITNESS:  No, I read it in English and I have no

4    idea.

5            THE COURT:  So which Singh is this?  This is

6    Baljinder?

7            MR. MARKOVSKI:  Puma.

8            THE COURT:  Is this your signature on the affidavit?

9            THE WITNESS:  Yes.

10           THE COURT:  Why did you sign this if you didn't know

11   what it says?

12           THE WITNESS:  I don't know.

13           THE COURT:  You don't know.  Okay.

14           MR. MARKOVSKI:  No further, Your Honor.

15           THE COURT:  Anything, Mr. Silver?

16           MR. SILVER:  Nothing further.

17           THE COURT:  You can step down.  Mr. Silver, we're

18   going to take ten minutes.  You're going to tell your clients

19   they can come back in. through the interpreter you're going to

20   tell them if they keep quiet, they don't raise their hands,

21   they just sit still during the testimony.  We're going to go

22   late.  We're going to finish this tonight.  I don't care if

23   it's 7:00.  I don't care if it's 8:00.

24           Mr. Markovski --

25           MR. MARKOVSKI:  Yes, sir.

1          THE COURT:  -- I think I understand what you're

2     trying to show here but there's a problem.  You're in default

3     in the case.  The law says that once you've defaulted you've

4     admitted what's claimed against you.  In other words, the

5     plaintiffs have alleged that you were their employer and you

6     didn't pay them and that's now deemed admitted for purposes of

7     this case because you didn't come in and defend it and Sunn

8     still hasn't come in to defend it.

9          So the only question that I'm allowed to decide

10    under the law at this hearing is how much these people are

11    owed for the hours that they claim they worked.  Not whether

12    you owed them or not, not whether you were their employer or

13    not.  You defaulted.  You didn't answer the complaint.  You

14    can't just ignore a lawsuit.  You end up admitting as a matter

15    of law what you're accused of doing.  That's your predicament.

16    I want you to understand that before the hearing is over so

17    that you can think about what you want to do about it if

18    anything.

19          I'll see you at 4:00.

20          MR. MARKOVSKI:  Your Honor, can he go now?

21          THE COURT:  He can go.  You have more questions for

22    this guy?

23          MR. MARKOVSKI:  No, but I would question something

24    on the last thing that he said.

25          THE COURT:  Yes.

60

1          MR. MARKOVSKI:  It's up to me whether I want to do
2    this or not.

3          THE COURT:  Meaning?

4          MR. MARKOVSKI:  You don't understand.  Like we're
5    going to finish everything we're going to finish; correct?

6          THE COURT:  Then I'm going to recommend to Judge
7    Cogan a dollar amount that you owe the plaintiffs.  I'm not
8    even empowered to say that you don't owe them anything because
9    you weren't really their boss.  That's already been
10   established.

11         MR. MARKOVSKI:  That I was directly their boss, that
12   they worked directly for Sunn Enterprise.

13         THE COURT:  That they worked for Sunn and for you,
14   yes.  That's been -- that's what they complained in their
15   pleading.  You didn't answer it.  When you don't answer a
16   complaint it's the same thing in the law as admitting what the
17   complaint says.  So you've already admitted that.

18         MR. MARKOVSKI:  Your Honor, PNS has not paid
19   [inaudible].

20         THE COURT:  Sir, that's a defense you could have
21   raised if you came in to defend the lawsuit but you chose not
22   to.  So here we are.  You've ignored the lawsuit and by doing
23   so you admit what you're accused of.  If you want to hire a
24   lawyer to try to challenge that or you think you can challenge
25   that, more power to you.  See you in ten minutes.

```
              Dulla Singh - Direct                    61
```

1  (Off the record at 3:46 p.m.)

2  (Back on the record at 4:03 p.m.)

3        THE COURT:  ... Mr. Chatterjde -- exactly how you

4  came to retain Mr. Chatterjde and what we know about his

5  qualifications as an interpreter.

6        MR. SILVER:  I asked my secretary to call the person

7  she usually calls to get an interpreter.  I think it was the

8  court reporting service that I use and they indicated they

9  would retain someone and --

10        THE COURT:  Mr. Chatterjde, can you tell us

11  something for the record about your qualifications as a

12  Punjabi interpreter, please?

13  (Interpreter's accent very thick - cannot be understood.)

14        THE INTERPRETER:  Yes.  I have been interpreting

15  almost 25 years now and I did [inaudible] and I've been

16  working with Trans Perfect and the [inaudible], the

17  international company all over the world interpretation and

18  translations.  I've been working with the U.S. court for a

19  long time.

20        THE COURT:  So you've interpreted in federal court

21  proceedings before?

22        THE INTERPRETER:  Yes.  Southern District, same

23  district, and also other part of the country.

24        THE COURT:  Thank you.  Can you call your next

25  witness, Mr. Silver, if you have another one?  Are you going

Dulla Singh - Direct                          62

1    to bring them in with my instruction or are they going to wait

2    outside?

3           MR. SILVER:  I think we're going to leave them

4    outside.

5           THE COURT:  It's your choice.

6                    [Pause in proceedings.]

7           THE COURT:  Please come forward.  Raise your right

8    hand.

9              DULLA SINGH, PLAINTIFF, SWORN

10          THE COURT:  Tell me your name.

11          THE WITNESS:  Dulla Singh.

12          THE COURT:  Mr. Singh, please be seated.  Mr.

13   Silver, please inquire.

14                   DIRECT EXAMINATION

15   BY MR. SILVER:

16   Q.   Mr. Singh, did you work for -- did you work Sunn

17   Enterprises doing construction?

18   A.   Yes, I did.

19   Q.   Which locations?

20   A.   Flushing.

21   Q.   Any locations in Brooklyn too?

22   A.   No.

23   Q.   I'm going to show you two documents.

24          MR. MARKOVSKI:  The gentleman is who?  I'm sorry.

25          THE COURT:  This is Dulla, D-U-L-L-A, Singh.

Dulla Singh - Direct                          63

1          MR. MARKOVSKI:  He only worked where?  I'm sorry.

2          THE COURT:  He said he only worked in Flushing, not

3  in Brooklyn.  Yes, I know the affidavit says something

4  different.

5  BY MR. SILVER:

6  Q.   Mr. Singh, were those the records you prepared about the

7  time, the days that you worked at Sunn Enterprises?

8  A.   Every day when I return home after work I used to write

9  down how many hours I worked that day.

10  Q.   Did they tell you how much they were going to pay you?

11  A.   $250.

12  Q.   Did you get paid anything?

13  A.   No.

14  Q.   What kind of work were you doing?

15  A.   I did work for grinding, pointing and I changed the lenta

16  [Ph.] and mixed the cement.

17  Q.   How many days did you actually work in total?

18  A.   17 days.

19          MR. SILVER:  I have no further questions.

20          THE COURT:  Who told you you would get paid $250?

21          THE WITNESS:  Sasha.

22          THE COURT:  Do you have -- have you marked a copy of

23  the exhibit, Mr. Silver?

24          MR. SILVER:  No, I --

25          THE COURT:  Are you offering it?

```
                   Dulla Singh - Cross                    64
```

1              MR. SILVER:  I offer it into evidence.

2              THE COURT:  Yes, Plaintiff's Exhibit 2.

3                   (Plaintiff's Exhibit 3, Received.)

4              THE COURT:  Do we have a copy that's marked?

5              MR. SILVER:  No.  It's the original.

6              THE COURT:  Mr. Silver, next time you appear in my

7   courtroom for an evidentiary hearing you'll pre-mark your

8   exhibits, please.

9              MR. SILVER:  Yes, Your Honor.

10             THE COURT:  Would you like to question this witness?

11             MR. MARKOVSKI:  Yes.

12                        CROSS-EXAMINATION

13  BY MR. MARKOVSKI:

14  Q.   Mr. Singh, were you hired to work for Sunn Enterprises

15  Group directly by me?

16  A.   I had agreement and conversation with Sasha.  One time

17  you came to Flushing location with Sasha.

18             THE COURT:  Do you know how to spell Sasha or what

19  Sasha's full name is?

20             THE WITNESS:  I don't know full name.

21  Q.   Sasha was the one to tell you that you were going to get

22  paid $250 for each work day and not me; correct?

23  A.   Sasha told me and also he also was with Sasha.

24             THE COURT:  Who he?

25             THE WITNESS:  This is the person.

1           THE COURT:  Mr. Markovich [sic] sitting here in

2    court?

3           THE WITNESS:  Yes.

4           THE COURT:  Markovski.  I'm sorry.  I keep

5    mispronouncing your name.

6    BY MR. MARKOVSKI:

7    Q.   Do you recall a place where I told you that you're going

8    to get paid $250 a day?

9    A.   At the Flushing when you came to the job location.

10   Q.   So I have spoken to you personally?

11          MR. SILVER:  Your Honor, I'm going to object just as

12   per your direction before we took a break.  This is really a

13   question of damages.

14          THE COURT:  Well, but it goes -- it goes to what the

15   hourly wage was.  So I really can't preclude it.  Overruled.

16          THE INTERPRETER:  Can you repeat the question again?

17          THE COURT:  Who told you -- excuse me.  Did Mr.

18   Markovski tell you he would pay you $250 a day?

19          THE WITNESS:  Sasha and him both were together but

20   Sasha told me that.

21          THE COURT:  And Mr. Markovski was with him at that

22   time?

23          THE WITNESS:  Yes, yes.

24          THE COURT:  In what language was Sasha speaking when

25   he told you that?

Dulla Singh - Cross                                    66

1          THE WITNESS:  In English.

2    BY MR. MARKOVSKI:

3    Q.    Besides the sign in sheets that you have -- that you have

4    written on your own, was there any sign in sheets that you

5    were signing in with a company name or logo on it on this

6    three -- or one job day you were at?

7    A.    Yes.  The name was Demetria.

8    Q.    The sign in sheets that you were signing, the name on the

9    sign in sheets was Sunn Enterprises; correct?

10   A.    Yes, every day the truck used to come and Demetria is to

11   come with the truck and with the company sign in sheet used to

12   get our signature and used to go after that.

13   Q.    Did you ever ask to have a copy of the sign in sheets?

14   A.    No, I didn't but he was to tell me that I have to collect

15   all this and give it to the office.

16   Q.    Do you recall what the sign in sheet looked like?  When

17   you had it there was it sign in/sign out, total hours,

18   anything?

19   A.    Nothing was like that but only things he used to sign me

20   eight hours I worked and there's the signature after that.

21   Q.    So eight hours every day?

22   A.    Yes.

23   Q.    The affidavit says that you had worked 17 days.

24   A.    Yes.

25   Q.    Did you get paid any overtime?

```
                    Dulla Singh - Cross                        67
```

1  A.   I didn't know what times.  So how did I get paid for what

2  time?  That was a church.

3            THE COURT:  That was a what?

4            THE INTERPRETER:  Chart.

5            THE COURT:  Charge.

6            THE INTERPRETER:  No, chart, C-H-U-R --

7            MR. MARKOVSKI:  No, church, I believe, Your Honor.

8            THE COURT:  I'm sorry.

9            MR. MARKOVSKI:  I believe he's referring to the

10 church.

11           THE COURT:  The church job.  Thank you.  My hearing

12 must be going.

13 BY MR. MARKOVSKI:

14 Q.   Did you have an interpreter when you signed the

15 affidavit?

16 A.   Which one, what the lawyer gave me?

17           THE COURT:  I show you what's been -- what is Pages

18 13 and 14 of 20-2.  Is that your signature?

19           THE WITNESS:  Yes, that's me.

20           THE COURT:  Was it translated for you before you

21 signed it?

22           THE WITNESS:  I know little bit English.  I could

23 read a little English.  Not much but only thing I understood

24 is that how much lawyer will get and how much I get.

25           THE COURT:  Where in here does it say how much the

Dulla Singh - Cross                              68

1   lawyer will get?  Did you know what you were signing when you

2   signed this?

3           THE WITNESS:  Only I remember that lawyer going to

4   help me.  That's why he get signature.

5           THE COURT:  Do you know that you signed a sworn

6   statement saying that you worked at the two Brooklyn locations

7   and in Flushing and that you signed it under oath?

8           THE WITNESS:  No, I thought I only signed for the

9   Flushing location.

10          MR. MARKOVSKI:  I don't have any further questions,

11  Your Honor.

12          THE COURT:  Anything from you, Mr. Silver?

13          MR. SILVER:  Sorry?

14          THE COURT:  Do you have any other questions?

15          MR. SILVER:  No, I do not.

16          THE COURT:  Please step down.  Bring in your next

17  witness.

18                  [Pause in proceedings.]

19          MR. MARKOVSKI:  I don't think he understands what

20  speaking under oath means.

21                  [Pause in proceedings.]

22              PRABHJIT SINGH, PLAINTIFF, SWORN

23          THE COURT:  Where is the exhibit that that witness

24  had?  Where is the Exhibit 2 from the witness -- okay, great.

25          State your name.

1        THE WITNESS:  Prabhjit Singh.

2        THE COURT:  Is there an affidavit -- here we go.  Do

3   you understand the interpreter?

4        THE WITNESS:  Yes.

5        THE COURT:  Does he speak English?

6        THE WITNESS:  A little bit.

7        THE COURT:  Would you rather testify in English or

8   with the interpreter?

9        THE WITNESS:  Interpreter.

10        THE COURT:  Go ahead.

11                    DIRECT EXAMINATION

12   BY MR. SILVER:

13   Q.   Mr. Singh, you worked for Sunn Enterprises?

14   A.   Yes.

15   Q.   What kind of work did you do?

16   A.   Brick layer.

17        THE COURT:  When he answers in English you don't

18   have to translate it if you don't want to.

19        THE INTERPRETER:  Okay.  The court just ask me to

20   say everything.

21        THE COURT:  Say everything he says in -- okay.  In

22   Punjabi obviously.  Go ahead.  Mr. Silver, next question.

23   Q.   Were you told by anyone how much you were going to get

24   paid?

25   A.   Yes.

Prabhjit Singh - Direct                    70

1   Q.   Who told you how much you were going to get paid?

2   A.   Sasha.

3   Q.   How much did he tell you you were going to get paid?

4   A.   300.

5   Q.   Did you keep records of the days that you worked?

6   A.   Yes, I did.

7   Q.   In front of you is a document that's been marked as

8   Exhibit 3.  Do you see that document?

9   A.   Yes.

10  Q.   Are those the records that you kept of the days that you

11  worked?

12  A.   Yes.

13  Q.   For example, in the column that has a caption --

14                      [Pause in proceedings.]

15          MR. SILVER:  I'm sorry, Your Honor.

16  Q.   -- has a caption August 9, 2016, does that mean that you

17  worked on that date?

18  A.   Yes.

19  Q.   How many hours did you work on that day?

20  A.   Eight hours.

21  Q.   For every date we have --

22          MR. SILVER:  Strike that.

23  Q.   In the middle there's a column September 4, 2016.  Next

24  to No. 6 is a number one and a half.  What does that mean?

25  A.   I worked that day 12 hours.

                    Prabhjit Singh - Cross                    71

1            THE COURT:  Every time you worked overtime it was

2    always for four hours, never for two hours, never for three

3    hours, never for five hours?  You worked eight hours or you

4    worked 12 hours, never in between?

5            THE WITNESS:  No.

6    BY MR. SILVER:

7    Q.   Which locations did you work?

8    A.   Brooklyn and Queens.

9    Q.   How many locations in Brooklyn?

10   A.   Two.

11   Q.   What was at that location, what kind of building?

12   A.   School building.

13   Q.   The one in the other location, the third location, what

14   was that -- what was that building?

15   A.   Church.

16   Q.   Were you paid anything?

17   A.   No.

18           MR. SILVER:  No further questions.  I'm sorry.  I'd

19   like to offer this into evidence.

20           THE COURT:  Plaintiff's Exhibit 3 is received.

21              (Plaintiff's Exhibit 3, Received.)

22           THE COURT:  Anything?

23                      CROSS-EXAMINATION

24   BY MR. MARKOVSKI:

25   Q.   Mr. Singh, when we were referring to Exhibit 3 I'm not

1   really clear on [inaudible].  The way I'm reading it is these

2   are the dates for that particular month and the only hours,

3   what seems to be hours it's only eight days only.  Does that

4   mean that he --

5           MR. SILVER:  I was waiting for the end of it.  Is

6   that in the form of a question?

7   BY MR. MARKOVSKI:

8   Q.   Mr. Singh, Exhibit 3 was provided to the court by you.

9   Would you explain something for me, please?  In the first

10  column what do those numbers mean and the letter 12, 13?  What

11  is that?

12  A.   Those are the days I worked.

13  Q.   How many hours you work those days?

14  A.   Eight hours.

15          THE COURT:  So you only made an additional notation

16  where you worked overtime?

17          THE WITNESS:  Six, 10, 11, 13, 17.

18          THE COURT:  Not my question.  When you just wrote

19  down the date with no number next to it, does that mean you

20  worked an eight hour day without overtime?

21          THE WITNESS:  Yes, yes.

22  BY MR. MARKOVSKI:

23  Q.   What does the one and a half mean?

24  A.   One and -- it is showing that eight means eight months.

25  Eight months and the nine means September.  All this date I

                    Prabhjit Singh - Cross                    73

1   did --

2              THE COURT:  But, sir, the question was --

3              THE WITNESS:  Eight hours and 12 hours and 10 month

4   I worked all these days eight hours.

5              THE COURT:  The question was what does the one and a

6   half mean, not what the eight or nine means.  What does the

7   one and a half mean?

8              THE WITNESS:  Twelve hours.

9   BY MR. MARKOVSKI:

10  Q.   Besides -- you said your record of hours and days, were

11  you signing daily, sign in and out sheets with total hours?

12  A.   Yes, I did.

13  Q.   Do you recall the company name on those sign in sheets?

14  A.   Yes.  I used to work for three locations, three job

15  locations, and some of the place -- some of the locations

16  those just get signed by me.  Some other places they did it.

17             THE COURT:  The question was not that.  Is there a

18  problem with the tran -- with the interpretation or with the

19  witness' comprehension?

20             THE INTERPRETER:  His tendency to --

21             THE COURT:  I'm sorry.

22             THE INTERPRETER:  His tendency to speak more,

23  explain more.

24             THE COURT:  But he's not even answering the question

25  that's being asked.  Mr. Singh, pay attention to the question.

Prabhjit Singh - Cross                                74

1   When you signed time sheets for the employer, was there a

2   company name on those time sheets?

3           THE WITNESS:  No.

4           THE COURT:  You don't remember any letterhead or

5   company name on the top of the sign in sheet?

6           THE WITNESS:  Yes, I remember but it might be a

7   written company name somewhere on the side.

8           THE COURT:  You just don't remember?

9           THE WITNESS:  I don't.

10  BY MR. MARKOVSKI:

11  Q.   Who was the sign in sheet given by?

12  A.   There's a person there.  His name was Dennis.

13  Q.   Was he employed by Sunn Enterprise Group?

14  A.   Yes.

15  Q.   Was he -- to the best of your knowledge, was he in charge

16  of that -- what job site are you referring to where Dennis was

17  present?

18          MR. MARKOVSKI:  I'm sorry.  There's a couple of

19  questions together.  Can I clarify that question?

20          THE COURT:  What job site was Dennis present at?

21          THE WITNESS:  Brooklyn.

22          THE COURT:  Which Brooklyn?

23          THE WITNESS:  Aberdeen Street.

24          THE COURT:  Aberdeen.

25          THE WITNESS:  Aberdeen Street.

Prabhjit Singh - Cross                          75

1   Q.   So to your knowledge Dennis was in charge of Aberdeen

2   Street project and he was working directly for Sunn

3   Enterprise?

4              MR. SILVER:   Objection.   Compound question.   There

5   are two questions there.   A very important question.

6              THE COURT:   Separate them out.

7   Q.   To the best of your knowledge, was Dennis in charge of 2

8   Aberdeen Street?

9   A.   Yes.

10  Q.   To the best of your knowledge, do you know if Dennis was

11  employed directly by Sunn Enterprise Group?

12  A.   Yes.

13             THE COURT:   Out loud, please.

14  A.   Yes.

15  Q.   Did you ever ask Dennis for a copy of the sign in sheets?

16  A.   No.

17  Q.   Did you ever ask Sunn Enterprises office for a copy of

18  the sign in sheets?

19  A.   No.

20  Q.   On your days that you had what appears to be more than

21  eight hours of work, who told you that you were actually get

22  eight for -- or how many hours for that particular day?

23  A.   This --

24             MR. SILVER:   Objection.   I'm --

25             THE COURT:   Sustained.   Who -- when you worked

Prabhjit Singh - Cross                    76

1  overtime, who asked you or told you that you would be required

2  to work more than eight hours that day?

3          THE WITNESS:  Dennis.

4          THE COURT:  Was that at all three locations?

5          THE WITNESS:  Whenever I used to work.

6  BY MR. MARKOVSKI:

7  Q.   Would you ask Dennis at the end of each day how many

8  hours we have today and then you would make your own notes?

9  A.   No.

10  Q.   So you just wrote down the hours what you thought you

11  should get paid for?

12          MR. SILVER:  Objection.

13          THE COURT:  Sustained.  Did those notes accurately

14  reflect the number of hours that you worked?

15          THE WITNESS:  Yes, when I worked for eight hours I

16  put eight hours.  When I worked for other I did --

17          THE COURT:  When did you prepare those notes?

18          THE WITNESS:  The same day I worked.  That same day

19  and same time.

20  BY MR. MARKOVSKI:

21  Q.   Do you know the company by the name of PNS Contracting

22  Group?

23  A.   No.

24  Q.   Have you ever worked for the company?

25  A.   No.

```
                    Prabhjit Singh - Cross                    77
```

1   Q.   The trade that you specialize in, do you normally get

2   paid $300 a day?

3           THE INTERPRETER:  Repeat the question again, please.

4   Q.   For the trade that he specializes in, I believe he was

5   doing brick work over there and -- what do you usually -- do

6   you normally get paid $300 a day?

7   A.   Yes.

8   Q.   Besides these three jobs, were you ever working together

9   with Mr. Puma Singh?

10  A.   No.

11          MR. MARKOVSKI:  I have no further questions, Your

12  Honor.

13          THE COURT:  Mr. Silver.

14          MR. SILVER:  No further questions.

15          THE COURT:  You're excused.  Next witness.

16          MR. MARKOVSKI:  I want to move this --

17          THE COURT:  Leave it here for me.

18                  [Pause in proceedings.]

19              JOGA SINGH, PLAINTIFF, SWORN

20          THE COURT:  Tell us your name.

21          THE WITNESS:  Joga Singh.

22          THE COURT:  Do you understand the Punjabi

23  interpretation?

24          THE WITNESS:  Yes, yes.

25          THE COURT:  Go ahead, Mr. Silver.

Joga Singh - Direct                                    78

1                      DIRECT EXAMINATION

2   BY MR. SILVER:

3   Q.    Good afternoon, Mr. Singh.  Did you do work for Sunn

4   Enterprises?

5   A.    Yes.

6   Q.    Do you know somebody by the name of Sasha?

7   A.    Yes, I know.

8   Q.    What kind of work did you do?

9   A.    I used to put the cement in the grinder and also I used

10  to mix the cement and help other worker.

11  Q.    Did anyone tell you how much you were going to be paid?

12  A.    Puma and Sasha both told me you will get $200 a day.

13            THE COURT:  Who and Sasha?

14            THE WITNESS:  Mr. Puma Singh.

15            THE COURT:  Next question.

16  Q.    Did you get paid anything for the work that you did?

17  A.    No, no.

18  Q.    The document in front of you, is that your record that

19  you prepared of the days that you worked?

20  A.    Yes, I did.  I did every day.

21  Q.    Did you make entries of your day?

22  A.    The day I worked there every day I go.

23  Q.    Next to certain of the dates there is the -- there is --

24  it's written one-half.  Can you tell the court what that

25  means?

Joga Singh - Direct                          79

1    I'm sorry, let me give a specific example.  There are

2  three columns.  Do you see the middle column that begins with

3  September 1?

4  A.   That one when I started at eight a.m. and finish at eight

5  p.m.

6  Q.   So the one-half, does that mean that you worked extra

7  hours beyond eight hours that day?

8  A.   Yes, yes, yes.  I work 12 hours that day.

9  Q.   For the dates that you wrote down that you did not

10  have -- you did not add one-half, does that mean you worked

11  eight hours those days?

12  A.   Yes, yes.  Yes, all other I work for eight hours.

13  Q.   I'm sorry.  I may have asked this.  Did you get paid

14  anything by anyone?

15  A.   No, I didn't get -- every time they say wait.  When we

16  get the money you will get it.

17          MR. SILVER:  At this time I offer the document into

18  evidence, Your Honor.

19          THE COURT:  What's the number?

20          MR. SILVER:  4.

21          THE COURT:  Plaintiff's 4 is received.

22              (Plaintiff's Exhibit 4, Received.)

23          MR. SILVER:  No further questions.

24          THE COURT:  May I see the document, please?

25              [Pause in proceedings.]

1                        CROSS-EXAMINATION

2    BY MR. MARKOVSKI:

3    Q.    Who was telling you wait, wait, wait?

4    A.    Puma told me when they pay me then you will get paid.

5    Q.    On Exhibit 4, is that your handwriting?

6    A.    There's no exhibit here.

7    Q.    The hours that --

8    A.    Yes, I did at home.

9    Q.    There's another handwriting that says change 46.  Whose

10   handwriting is that?

11   A.    When I went to -- all other I did but I don't know

12   English.  So the way I did but this one in the office when I

13   went to the office they wrote this.

14   Q.    Whose office?

15   A.    Other people were present.

16   Q.    Whose office?

17   A.    When I went to the lawyer's office, our lawyer's office

18   then I took the help of others that you write for me that

19   time.  The top is my handwriting.

20   Q.    So your attorney knows more than you how many hours you

21   had worked?

22              THE COURT:  Sustained.

23              MR. SILVER:  Objection.

24              THE COURT:  Sustained.  We can all see that it was

25   arithmetic that was changed, not the number of hours worked.

Joga Singh - Cross                    81

1   Go ahead.  Ask your next question.

2   BY MR. MARKOVSKI:

3   Q.    Before starting work on this three job sites you said

4   that you were told by Mr. Puma saying that you are going to

5   get paid and how much you were going to get paid.  Correct?

6   A.    At the beginning he told me yes, every week and then say

7   every two weeks I get $200 per day.  Then I didn't get any

8   money and I got a job.

9   Q.    So after the first week that you did not get paid by Mr.

10  Puma, did you ask him why?

11  A.    Yes, I asked but he said wait.  There's some backlog.  So

12  you will get paid.  Since I have no job at all so I had no

13  choice but to work and to wait for the money.

14  Q.    After the second week you did not get paid, did you ask

15  Mr. Puma why?

16  A.    Yes, I asked but he said wait.  Everybody will get you

17  again.

18  Q.    If you were working directly for Sunn Enterprise Group,

19  did you ever call or contact the Sunn Enterprise Group for not

20  getting paid after so many weeks?

21            THE INTERPRETER:  Excuse me.

22            THE COURT:  If you were working directly for Sunn

23  Enterprise Group why didn't you call Sunn Enterprise Group to

24  complain that you weren't getting paid?

25            THE WITNESS:  Because I should know Puma and Puma

Joga Singh - Cross                              82

1   got me the job and so I don't have your number.  So I don't

2   know how to contact you.

3   Q.    Did you ever fill out any paperwork with Sunn Enterprise

4   Group, any applications, any tax papers -- this question --

5         THE COURT:  Did you ever fill out any papers such as

6   tax papers for Sunn Enterprise Group?

7         MR. MARKOVSKI:  Or application.

8         THE WITNESS:  Not daily but sometimes a person used

9   to come.  He's called Lin Denny and he used to come and get my

10  signature.  I don't know what I'm signing because I don't know

11  English at all.  So I -- I didn't know what I'm signing but

12  when he used to tell me to sign, I signed.  Sometimes.

13  BY MR. MARKOVSKI:

14  Q.    Have you ever worked for Sunn Enterprise Group prior to

15  this project?

16  A.    No.

17  Q.    Have you worked with Mr. Puma in the past besides these

18  three projects?

19  A.    No, no.  Only he used to [inaudible] me that I worked

20  this kind of work.  I didn't work for him.

21  Q.    This is the only time that he has had contact with Puma

22  only at these three job sites?

23        THE COURT:  No.  Did you ever work at a job that

24  Puma introduced you to or brought you to other than these

25  three job sites?

```
                    Joga Singh - Cross                    83
```

1           MR. MARKOVSKI:  Thank you.

2           THE WITNESS:  No, no.

3    BY MR. MARKOVSKI:

4    Q.   How were you expected to get paid, cash or with a check?

5    How [inaudible] Puma pay?

6           MR. SILVER:  I'm sorry.  Can I hear the last part?

7    A.   He told me to wait.  Whatever way we get the money it

8    might be cash.  It might be check because he could get the

9    check, he could get the check, he could get the cash, he get

10   the cash.  Usually I might get the cash.

11          MR. MARKOVSKI:  No further questions, Your Honor.

12          THE COURT:  Anything, Mr. Silver?

13          MR. SILVER:  Nothing further.

14          THE COURT:  Step down.  Get the next witness in.

15                    [Pause in proceedings.]

16          THE COURT:  Come forward and be sworn.

17           MOHINDER SINGH, PLAINTIFF, SWORN

18          THE COURT:  Tell me your name.

19          THE WITNESS:  Mohinder Singh.

20          THE COURT:  Are you understanding the Punjabi

21   interpreter?

22          THE WITNESS:  Yes.

23          THE COURT:  Be seated.  Mr. Silver.

24                    DIRECT EXAMINATION

25   BY MR. SILVER:

Mohinder Singh - Direct                    84

1  Q.    Mr. Singh, did you do work for Sunn Enterprises and

2  Sasha?

3  A.    Yes.

4  Q.    What kind of work did you do?

5  A.    Grinding and pointing and stone.

6            THE COURT:  Grinding and what?

7            THE INTERPRETER:  Pointing.

8            THE COURT:  Pointing.

9            THE INTERPRETER:  And stone.

10            THE COURT:  Thank you.

11  Q.    Did you have an agreement with Sunn Enterprises and Sasha

12  how much they were going to pay you to do that work?

13  A.    $200.  $200.

14            THE COURT:  Who told you that?

15            THE WITNESS:  Sasha.

16  Q.    Did you keep records of the days that you worked?

17  A.    Yes, I did.

18  Q.    I show you Plaintiff's Exhibit 5.  Are those the records

19  you kept -- you prepared about the days that you worked?

20  A.    Yes.

21  Q.    Each day that you worked did you -- was it for an eight

22  hour period?

23  A.    Yes.

24  Q.    Those are the records you prepared on the days that you

25  worked?

Mohinder Singh - Cross                              85

1   A.    Yes.

2                MR. SILVER:  I offer that into evidence.

3                THE COURT:  As?

4                MR. SILVER:  Plaintiff's 5.

5                THE COURT:  Plaintiff's 5 is in evidence.

6                   (Plaintiff's Exhibit 5, Received.)

7                THE COURT:  May I see it?

8                MR. SILVER:  Yes.

9                THE COURT:  Thank you.  Go ahead.  Next.

10               MR. SILVER:  I have nothing further.

11                         CROSS-EXAMINATION

12  BY MR. MARKOVSKI:

13  Q.    Mr. Singh, the paper that you had provided, where does it

14  say how many days [sic] you had worked every day?

15  A.    Eight hours a day.

16  Q.    Does this mean that it's one hour or it's minus one hour?

17  What does one mean, minus one?

18  A.    This is every day like August 8, '16 one day, eight

19  hours.  August 9, '16 one day, eight hours.

20  Q.    Where does it say the hours?

21  A.    I didn't write it.

22               THE COURT:  Mr. Singh, when did you prepare that

23  paper?

24               THE WITNESS:  The day I worked.

25               THE COURT:  When did you give it to your lawyer?

Mohinder Singh - Cross                         86

1   When did you give it to your lawyer?

2            THE WITNESS:  When the lawyer started the case, that

3   time.

4   BY MR. MARKOVSKI:

5   Q.   Can we assume that each day had maybe two hours or three

6   hours or four hours?

7            THE COURT:  Is it possible that you worked less than

8   eight hours on any of these days?

9            THE WITNESS:  No.

10           MR. MARKOVSKI:  Your Honor, can we actually have

11  something like this admissible in court?

12           MR. SILVER:  Objection.

13           THE COURT:  It says 15 days.

14           MR. SILVER:  Commentary.

15           THE COURT:  It's an objection.  Your objection is

16  overruled.

17  Q.   Besides this paper, did you sign anything, any time sheet

18  on any of the job sites?

19  A.   Yes.

20  Q.   Do you recall what was the name on the sign in sheets?

21  A.   Sasha used to give it to me and it was written in

22  English.  So I don't know what was it.

23  Q.   Was Sasha present every day where he was signing?

24  A.   Yes.

25  Q.   You worked on all three job sites; correct?

Mohinder Singh - Cross                    87

1  A.    Yes.

2  Q.    And Sasha was present every time he signed every day on

3  either one of the job sites Sasha was present there?

4  A.    Sasha used to get sign two days and another foreman is --

5  was there to get signed.

6          THE COURT:  Wait, wait.  Another what man?

7          THE INTERPRETER:  Foreman.

8          THE COURT:  Poor, P-O-O-R?

9          THE INTERPRETER:  Foreman.

10          THE COURT:  Foreman, sorry.

11  Q.    You just said that Sasha was present at all times there

12  when you were signing and your answering these things under

13  oath.

14          THE COURT:  You have to ask a question.  You can't

15  just argue with the man.

16  Q.    You just said that Sasha was present every time you

17  signed the time sheet on every one of the job sites that you

18  worked at.  That was not what you said prior.  Are you

19  changing your mind now?

20  A.    Two days, three days Sasha was present at the job

21  location but all the time the foreman was there for Sasha.

22          THE COURT:  What is the foreman's name, do you

23  remember?

24          THE WITNESS:  I don't remember.

25  Q.    Did you ever ask for the sign in sheets?  Did he ever ask

Mohinder Singh - Cross                              88

1  for a copy of the sign in sheets?

2  A.      No, I didn't.

3  Q.      Before you got to the job sites for work, did you know

4  you were going to be working for Sunn Enterprise Group?

5  A.      Yes.

6  Q.      So you went to Sunn Enterprise's office and filled out

7  paperwork or had an interview with anybody.

8          MR. SILVER:  Object as to the form.  Is that a

9  question?

10         THE COURT:  Could you repeat it again?

11 BY MR. MARKOVSKI:

12 Q.      Did you ever go to Sunn Enterprise's office and sign an

13 application or fill out any type of paperwork or go through

14 any formal interview?

15         THE COURT:  Let him finish the question.

16 A.      No, I didn't go to the office.

17 Q.      How did you find out about the work that's available at

18 those three job sites?

19 A.      I used to have contact with Puma.

20 Q.      Have you done any other work with Puma besides these

21 three job sites?

22 A.      No.

23 Q.      Who told you that you were going to get paid $200 an

24 hour?  I mean -- I'm sorry.  Per day.

25 A.      Sasha and Puma.

```
                   Mohinder Singh - Cross                      89
```

1  Q.   Do you remember where you were when Sasha and Puma told

2  you you were going to get $200 a day?

3  A.   It's all three places school jobs in Brooklyn and

4  Flushing church job.

5  Q.   So at each job site, Puma and Sasha told you that you

6  were going to get paid $200 a day?

7  A.   Yes.  Per day I get $200.

8          THE COURT:  The question was, though, did they tell

9  you that three times at each job site or one time to cover all

10 three job sites?

11         THE WITNESS:  They told me one place for all three,

12 but I never got the money.

13         THE COURT:  Which place did they tell you?

14         THE WITNESS:  Brooklyn 49th Street.

15 BY MR. MARKOVSKI:

16 Q.    So you're changing your mind again now for the previous

17 statement?

18         THE COURT:  No, no.  Next question.  No arguing with

19 the witness.

20 BY MR. MARKOVSKI:

21 Q.    After the first week that you did not get paid, did you

22 bring up the issue to someone?

23 A.    I asked Puma.

24 Q.    Did you ask Sasha?

25 A.    No.

Mohinder Singh - Cross                    90

1   Q.      Did you call Sunn Enterprise's office?

2   A.      Five to six people went to that office.

3   Q.      No.  After the first week that you did not get paid,

4   did you call Sunn Enterprise office and said where is my

5   money?

6   A.      I asked Puma -- Puma asked their office and Puma also

7   went to the office with five to six people.

8           THE COURT:  But the question, sir, listen to the

9   question.  Did you pick up a telephone and call Sunn's office?

10          MR. MARKOVSKI:  After the first week.

11          THE COURT:  When you didn't get paid --

12          THE WITNESS:  No, I didn't.

13  BY MR. MARKOVSKI:

14  Q.   What about after the second week you did not get paid,

15  who did you bring up the issue to?

16  A.   I told Puma and I stop work.

17  Q.   If you were working directly for Sunn Enterprise Group,

18  why wouldn't you call the office directly?

19  A.   I used to go to work early morning and I finish late

20  evening.  If I call or go to the office then I lose that day

21  of work.

22  Q.   There's such a thing as voice mails.  There's such thing

23  as emails --

24          MR. SILVER:  Objection.  That sounds like it's

25  arguing.

```
                    Armajit Singh - Direct                    91
```

1            THE COURT:  I want to hear the question before I

2    rule.  Thank you.  You may finish your question.

3    BY MR. MARKOVSKI:

4    Q.    Any one of these means or methods could have been done

5    if there was a concern of not being paid.  That's what I would

6    have done definitely.

7            MR. SILVER:  Objection to --

8            THE COURT:  He's making -- he's venting.  Do you

9    have any more questions for the witness?

10   BY MR. MARKOVSKI:

11   Q.    Why did you stop working on those three job sites?

12   A.    Because I didn't get the money.

13   Q.    Was there more work available on those three job sites?

14           MR. SILVER:  Objection.

15           THE COURT:  Overruled.  Did you get fired or told

16   that there was no more work?

17           THE WITNESS:  No.  I stopped myself.

18   BY MR. MARKOVSKI:

19   Q.    Do you know if any one of your colleagues stood on those

20   job sites after you left?

21           MR. SILVER:  Objection to -- I'm sorry.  I'll

22   withdraw it.

23           THE COURT:  Did any of the other plaintiffs continue

24   working even after you left if you know?

25           THE WITNESS:  Yes.  Some people they did but I

```
                    Armajit Singh - Direct                    92
```

 1   didn't have any money.  I had no other choice.

 2          MR. MARKOVSKI: No more questions, Your Honor.

 3          THE COURT:  Anything from you?

 4          MR. SILVER:  Nothing, Your Honor.

 5          THE COURT:  Next witness.

 6                    [Pause in proceedings.]

 7          THE COURT:  Raise your right hand.

 8              AMARJIT SINGH, PLAINTIFF, SWORN

 9          THE COURT:  Sit down.  Do you understand the Punjabi

10   translation?

11          THE WITNESS:  Yes.

12          THE COURT:  Go ahead.

13                    DIRECT EXAMINATION

14   BY MR. SILVER:

15   Q.   Mr. Singh, did you do work for Sunn Enterprises and

16   Sasha?

17   A.   Yes, I did.

18   Q.   What kind of work did you do?

19   A.   I worked as a helper.

20   Q.   And were you paid any money for the work that you

21   performed?

22   A.   No money.

23   Q.   How much were you supposed to be paid?

24   A.   $200 per day.

25   Q    And did you -- I may have asked -- what kind of work did

Armajit Singh - Direct                    93

1   you do?

2   A.    Cementing block.  Mixing -- cementing and mixing.

3   Q.    Did you keep records of the dates that you worked?

4   A.    Yes, I did.

5   Q.    That's the document in front of you, Plaintiff's Exhibit

6   8 -- 6, rather?

7   A.    Yes.

8   Q.    And you prepared those records for each day that you

9   worked?

10  A.    Yes.

11  Q.    Did you work a total of 18 days?

12  A.    Yes, I did.

13          MR. SILVER:  I offer Plaintiff's 6 in evidence at

14  this time.

15          THE COURT:  Plaintiff's 6 is received.

16              (Plaintiff's Exhibit 6, Received.)

17          MR. SILVER:  No further questions.

18          THE COURT:  When did you prepare that paper?

19          THE WITNESS:  The day I worked first I did the rough

20  and then I read the correction and everything after I finished

21  all of my work.

22          THE COURT:  And when did you give it to your lawyer?

23          THE WITNESS:  I don't remember the date.  Maybe

24  three months or something.  I don't remember the date.

25          THE COURT:  Mr. Markovski?

Amarjit Singh - Cross                                94

1          MR. MARKOVSKI: Yes, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. MARKOVSKI:

4    Q.    Mr. Singh, did you work for Sunn Enterprise Group on

5    these three job sites, Aberdeen Street, 29th Street and

6    Parsons Boulevard?

7    A.    Yes.  Two places in Brooklyn and third one on Parsons

8    Boulevard.

9    Q.    Who hired you from Sunn Enterprise Group?

10   A.    Sasha and Puma Singh used to take me there.

11   Q.    How did you hear about the work available on these three

12   job sites?

13   A.    Hamasan [Ph.] told me that there's work there.

14   Q.    Have you done any other work with Puma Singh?

15   A.    Yes, I did work before.

16   Q.    Is this the first time that you did the work for Sunn

17   Enterprise Group?

18   A.    Yes, first time.

19   Q.    Did you work with Puma Singh in New Jersey for Sunn

20   Enterprise Group?

21   A.    No, I didn't.

22   Q.    Were you signing any company's sheets on a daily basis?

23   A.    No, I didn't.

24   Q.    You did not sign any paperwork on the job sites?

25   A.    No.

Amarjit Singh - Cross                          95

1  Q.   After the first week you did not get paid, did you talk

2  to somebody from Sunn Enterprise Group?

3  A.   Yes, I asked Puma Singh to get the money.

4  Q.   Do you know if Puma Singh works directly for Sunn

5  Enterprise Group?

6  A.   I used to know that Puma Singh used to work with Sasha

7  with that company.

8  Q.   So would you say that Puma Singh was the contact point on

9  that job site, a foreman, a manager, a project manager, or

10 anything?

11          MR. SILVER:  I'm going to object to that.  It's a

12 bit too broad.

13          MR. MARKOVSKI:  Well, I don't know if he's going to

14 say --

15          THE COURT:  What -- did Puma Singh have any kind of

16 supervision at that job site?

17          THE WITNESS:  No, nothing like that.

18          THE COURT:  Did he tell you what you were supposed

19 to do, give you tasks to perform?

20          THE WITNESS:  Yes.  Puma Singh told me that there is

21 some job available with this company and the company in New

22 Jersey and they need helper, job, so I didn't have any job so

23 I said okay and so Puma Singh used to take me at the job

24 location and also after the work he used to bring me back

25 home.

1          THE COURT:  Okay.  Try to listen carefully to the

2     question.  Did you work in New Jersey?

3          THE WITNESS:  No.

4          THE COURT:  You just said that Mr. Singh was your

5     boss in New Jersey, but we'll put that aside.  What location

6     did you work?

7          THE WITNESS:  I worked two places in Brooklyn, one

8     on Parsons Boulevard.

9          THE COURT:  When you got to work in the morning, who

10    told you what your assignment was?

11         THE WITNESS:  I used to know Puma so Puma used to

12    tell me what the job is to be done that day and sometimes

13    Sasha used to come, but mostly Puma.

14    BY MR. MARKOVSKI:

15    Q.   After the second week you did not get paid, did you

16    contact somebody from Sunn Enterprise Group?

17    A.   Yes.  I asked Puma and Puma gave me 100 or $150 and told

18    me that when I get the full money then you get paid.

19    Q.   So Puma gave him how much?

20    A.   100 or 150.

21         THE COURT:  And he told you what?

22         THE WITNESS:  Later I get the money and I give you

23    the money and after that, the job was finished, so I didn't go

24    to work.

25    BY MR. MARKOVSKI:

1   Q.   So was he working for Puma or for Sunn Enterprises?

2   A.   I worked for Sunn Enterprise Company.

3   Q.   If Puma is not employed by Sunn Enterprise Group, why not

4   call Sunn Enterprise Group or anybody from Sunn Enterprise

5   Group about the pay?

6               MR. SILVER:  Objection.

7               THE COURT:  Overruled.

8               THE WITNESS:  I have a language problem and we

9   always trust Puma and because we have language problem we can

10  communicate with Puma easily and better.  That's the way we

11  should contact.

12  BY MR. MARKOVSKI:

13  Q.   So why isn't he asking for the money that he's owed from

14  Puma?

15              MR. SILVER:  Objection.

16              THE INTERPRETER:  I don't understand.  What did he

17  ask?

18              THE COURT:  Have you thought about suing Puma for

19  the money that you were owed?

20              THE WITNESS:  No, I didn't think of that.

21  BY MR. MARKOVSKI:

22  Q.   Excuse me?

23  A.   I didn't think.

24              THE COURT:  Go ahead.

25  Q.   Say it again.  I'm sorry.

Karnail Singh - Direct                    98

1          THE COURT:  The witness said, "No, I didn't think of

2   that."

3   BY MR. MARKOVSKI:

4   Q.   Oh, he didn't think of it.  So was it your idea to sue

5   Sunn Enterprise Group?

6          MR. SILVER:  I'm sorry --

7          THE COURT:  I feel like I'm translating the English

8   for everybody.  Let's try to pay attention --

9          MR. SILVER:  I'm trying to --

10          THE COURT:  -- so we don't have to repeat

11   everything.  Was it your idea to sue Sunn Enterprises?

12          MR. SILVER:  I'm going to object.

13          THE COURT:  Sustained.

14          MR. SILVER:  Attorney-client communications.

15          THE COURT:  Sustained.

16          MR. MARKOVSKI:  No more questions, Your Honor.

17          THE COURT:  Anything else, Mr. Silver?

18          MR. SILVER:  No.

19          THE INTERPRETER:  Two interpreters here, you and me.

20          THE COURT:  So you're going to split your fee?

21          THE INTERPRETER:  Yes, you should.

22                    [Pause in proceedings.]

23          THE COURT:  Next.  We have two more I think unless

24   the last one showed up.

25          THE INTERPRETER:  Due to the nature of these people

Karnail Singh - Direct                    99

1   they go to one person.  They don't go direct.

2            THE COURT:  You're not a witness here.

3            THE INTERPRETER:  I know.  I know.  I know.

4                    [Pause in proceedings.]

5            KARNAIL SINGH, PLAINTIFF, SWORN

6            THE COURT:  Tell me your name.

7            THE WITNESS:  Karnail Singh.

8            THE COURT:  K-A-R-N-A-I-L?

9            THE WITNESS:  Yes.

10           THE COURT:  Be seated.

11                    DIRECT EXAMINATION

12   BY MR. SILVER:

13   Q.   Mr. Singh, you did work for Sunn Enterprise and Sasha?

14   A.   Yes.

15   Q.   What kind of work did you do?

16   A.   Brick work.

17   Q.   Where did you the work, where did you do the brick work?

18   A.   One for the church, Flushing, and the schools in

19   Brooklyn.

20   Q.   Did you talk to Sunn Enterprises or Sasha about how much

21   you were getting to get paid?

22   A.   Yes.

23   Q.   Who did you talk to?

24   A.   Sasha.

25   Q.   And what did he --

```
                    Karnail Singh - Direct                    100
```

 1  A.    $300.

 2  Q.    I'm sorry?

 3  A.    $300.

 4  Q.    I'm sorry.  He said you were going to get paid $300?

 5  A.    Yes.

 6  Q.    Did you get paid anything?

 7  A.    Nothing.

 8  Q.    Okay.  I show you a document that's been marked

 9  Plaintiff's Exhibit 7.  Are those the time records -- I'm

10  sorry.  Are those the records you kept of the days of your

11  employment?

12  A.    Yes, yes.

13  Q.    How many days in total did you work?

14  A.    17.

15  Q.    Okay.  And why did you stop work?

16           THE INTERPRETER:  Say that again.

17  Q.    Why did you stop working?

18  A.    Because I needed money and I didn't get the money.

19  That's why.

20  Q.    When you say you didn't get money, you mean were not paid

21  for the work that you had been doing?

22  A.    I received nothing.

23  Q.    Those records that you prepared, did you prepare them on

24  a daily basis on each day that you worked?

25  A.    Yes.  After I finish the work then I write.

Karnail Singh - Cross                    101

1              MR. SILVER:  I offer them into evidence at this time

2    as Plaintiff's 7.

3              THE COURT:  They're received.

4                   (Plaintiff's Exhibit 7, Received.)

5              MR. SILVER:  Nothing further.

6              THE COURT:  Mr. Singh, I just criticized counsel for

7    not paying close attention and now I'm guilty of the same

8    thing.  I think you said who told you you would get $300 a day

9    but I lost track of it.  Who told you you would get $300 a

10   day?

11             THE WITNESS:  Sasha.

12             THE COURT:  Where?

13             THE WITNESS:  Flushing.  Church.

14             THE COURT:  Thank you.  Mr. Markovski?

15                        CROSS-EXAMINATION

16   BY MR. MARKOVSKI:

17   Q.   When you needed work, did you call Sasha directly and say

18   Sasha, I need work?

19   A.   Yes.

20             THE COURT:  How did you know who Sasha was?

21             THE WITNESS:  I used to work for school in Flushing

22   and then the work stop and it stopped the work so then I don't

23   have a job so I ask several of my friends who used to work

24   there.  So they told me yes, there is some work going on and

25   Sasha is the person who can hire you, so go and talk to Sasha

Karnail Singh - Cross                    102

1   direct.  So then I went to talk to Sasha.

2           THE COURT:  Do you remember which friend it was who

3   told you about Sasha?

4           THE WITNESS:  All the Indian people they used to

5   work every time that someone need job, they was to talk to any

6   of those peoples who need work and they give us that.

7           THE COURT:  Sir, you didn't answer my question.  My

8   question is who the individual, not whether he's Indian or

9   not, who is the individual who gave you the contact for Sasha?

10          THE WITNESS:  There are four people used to work

11  there.  I don't know which one.  Maybe Kundan Lal, Prabhjit,

12  four people alone.  One of the four.

13          THE COURT:  Could it have been Puma Singh?

14          THE WITNESS:  Yes.  Maybe.

15  BY MR. MARKOVSKI:

16  Q.   Before these three job sites, did you know Sasha before?

17  A.   No.

18  Q.   How did you get his phone number?

19  A.   Oh, I went there by person.  I was -- I used to work

20  there close so I was coming from the location.  I just got off

21  from that location and I asked Sasha.

22          THE COURT:  The church, you mean?

23          THE WITNESS:  Church, yes.

24          THE COURT:  Who pointed Sasha out to you?  How did

25  you know who Sasha was?

Karnail Singh - Cross                          103

1          THE WITNESS:  All of the workers, my people used to

2    work there.

3    BY MR. MARKOVSKI:

4    Q.   Did you know who Sunn Enterprise Group is?

5    A.   Someone gave me the card.  I think the card from the same

6    company.  I don't know too much English, so maybe that

7    company.

8    Q.   But you knew enough English to ask Sasha for employment?

9          MR. SILVER:  Objection.

10         THE COURT:  Overruled.  Was your English good enough

11   to talk to Sasha about getting a job?

12         THE WITNESS:  No.  I asked -- I asked someone who

13   knows both, English and Punjabi, to help me.

14         THE COURT:  Do you remember who that was?

15         THE WITNESS:  One year past, I don't remember.  One

16   year already passed.

17   BY MR. MARKOVSKI:

18   Q.   So you don't remember who you approached Sasha with for

19   employment but you know it was Sasha; right?

20   A.   Our people used to work there.  All of those people.  So

21   I ask them do you have any job here.  They said yes, so I need

22   a person to talk so I talk.

23   Q.   Maybe Mr. Puma told them that there's work there?

24   A.   Puma also used to work there.  Puma was there.  There are

25   other guys.  I don't remember their full names.

Karnail Singh - Cross                    104

1   Q.    What type of work did you do on the job sites?

2   A.    Brick, lentil or stone or -- and the brick, all work.

3   Q.    Can you explain to me in English your trade in detail?

4              MR. SILVER:  I'm sorry.

5              THE COURT:  Sustained.  In English?

6              MR. MARKOVSKI:  Your Honor, I'm just trying to get

7   if he was to ask Sasha for work, Sasha would ask him what do

8   you know how to do.  So he would say I know how to do this and

9   this and this and this.  So if Sasha was the point man on the

10  job sites, on all these job sites like a super man, he would

11  tell him okay, you can do this and this and this because you

12  told me already what you know how to do.  That's what I'm

13  trying to get at.

14             THE COURT:  But the point is he's already testified

15  that he had someone with him to help translate when he spoke

16  to Sasha.  When you met with Sasha, did you -- did he ask you

17  what skills you had in connection with brick and stone work?

18             THE WITNESS:  Yes, I told him.  Yes, I can do the

19  brick job.

20             THE COURT:  Did you tell him what exp -- did you

21  have experience working brick?

22             THE WITNESS:  Yes.  I used to work the same work in

23  India.

24  BY MR. MARKOVSKI:

25  Q.    Did you call Sunn Enterprise Group after the first week

Karnail Singh - Cross                    105

1   of non-payment?

2   A.   No, I didn't.

3   Q.   Did you call after the second week of non-payment?

4   A.   No, I didn't.  Yes.  There are some other worker there so

5   I ask them when I get the money so they said maybe later.

6            THE COURT:  Who did you ask?

7            THE WITNESS:  The company person was there.  They

8   used to -- I don't remember the name but he was there all the

9   time for the work; what to do, what not to do.  That person.

10  I don't remember the name.

11           THE COURT:  When you say he was there, where are you

12  referring to?

13           THE WITNESS:  In the church.

14  BY MR. MARKOVSKI:

15  Q.   So you only worked in the church?

16  A.   Yes, I did church and also school.  Brooklyn.

17  Q.   How many jobs in Brooklyn?

18  A.   Only one location.

19  Q.   Which one?

20  A.   No, I was taken by car, so the school, but I don't know

21  the address.

22  Q.   Who was driving the car?

23  A.   That's my friend, Kundan Lal.

24  Q.   You signed an affidavit over here claiming you worked on

25  three job sites.  Are you aware of what you were signing?

Karnail Singh - Cross                    106

A.    I don't know.  So I didn't look at the paper and what is

in the paper I don't know and if any time anyone ask me to

sign, I used to sign.  I did one or two times like that.  I

don't know what I'm signing.  Whoever was in charge.

Q.    Do you know the addresses of the job sites that you

worked at?

A.    I used to go to the church but other place I don't know.

Brooklyn school, I don't know.

Q.    So the hours that you kept track of, what hours for what

project?

A.    This side is the school and other side is the church.

          THE COURT:  Stop.  Are you referring to -- excuse

me.  Let me see that, please.  Referring to the side with the

exhibit sticker and the side without it of Plaintiff's Exhibit

7 which has writing on both sides.  Which side is the school?

          THE WITNESS:  School, this -- that one.

          THE COURT:  The witness is pointing to the side of

Plaintiff's Exhibit 7 that does not bear the exhibit sticker,

but appears to bear his name in blue ink.  Next question.

BY MR. MARKOVSKI:

Q.    Did you ever call Sunn Enterprise's office for any

payments?

A.    No, I didn't.

Q.    Why not?

A.    I didn't have the number.

Karnail Singh - Cross                    107

1   Q.   Well, you just showed us a business card.

2        THE INTERPRETER:  Yes.  Let me finish what he said.

3   A.   So I don't have the number.  I had the card, but I don't

4   know much English to read the card and also I used to go to

5   work in the morning.  Finish in the evening.  I didn't have

6   time to call.

7   Q.   The same way he used to somebody else to translate to get

8   a job, you could not find somebody to call for you?

9        MR. SILVER:  Objection.  What's --

10       THE COURT:  Overruled.

11       THE WITNESS:  No, I didn't check that kind of help.

12  I thought I'll get paid.

13  BY MR. MARKOVSKI:

14  Q.   Have you worked with Mr. Puma on other job sites besides

15  these three?

16  A.   No, I didn't.  This is the first time.

17       MR. MARKOVSKI:  No more questions, Your Honor.

18       THE COURT:  Okay.  Anything?

19       MR. SILVER:  Nothing further.

20       THE COURT:  Next witness.

21              [Pause in proceedings.]

22       THE COURT:  I can't hear you but you shouldn't be

23  speaking to me outside of the presence of Mr. Silver anyway.

24       THE INTERPRETER:  I was thinking out loud.  I'm

25  sorry.

```
                         Lal - Direct                          108
```

1                    [Pause in proceedings.]

2                KUNDAN LAL, PLAINTIFF, SWORN

3           THE COURT:  What's your name?

4           THE WITNESS:  Kundan Lal.

5           THE COURT:  Do you understand the interpreter's

6    translation into Punjabi?

7           THE WITNESS:  Yes.

8           THE COURT:  Mr. Silver.

9                    DIRECT EXAMINATION

10   BY MR. SILVER:

11   Q.   Mr. Singh (sic), did you work at Sunn Enterprises and

12   Sasha --

13          THE COURT:  This is not Mr. Singh, Mr. Silver.  This

14   is Kundan Lal.

15          MR. SILVER:  I'm glad you corrected me, Your Honor.

16   BY MR. SILVER:

17   Q.   Kundan Lal, did you do work for Sunn Enterprises and

18   Sasha?

19   A.   Yes.

20   Q.   What kind of work did you do?

21   A.   Brick, pointing, stone work.

22   Q.   Did you have a conversation with anybody how much you

23   were going to be paid?

24   A.   Yeah.  I had with Sasha.

25   Q.   And what did Sasha tell you you were going to be paid?

                        Lal - Direct                           109

1    A.   He told me that whoever does the brick work gets $300 a

2    day.  He will get $300 a day.

3               THE COURT:  Where were you when Sasha told you this?

4               THE WITNESS:  Flushing.

5    BY MR. SILVER:

6    Q.   And Flushing, what building were you working on?

7    A.   Parsons Boulevard and church.

8    Q.   Did you work anywhere in Brooklyn?

9    A.   Two places in Brooklyn.

10   Q.   And the two places in Brooklyn, what kind of buildings

11   were those?

12   A.   School.

13   Q.   Did you prepare any records of the date that you worked?

14   Did you keep records of the days you worked?

15   A.   Yeah.  The day I worked I did.

16   Q.   In front of you is a document.  It has two sides.  It has

17   been marked Plaintiff's Exhibit 8.  Are those the records you

18   prepared about the days that you worked?

19   A.   Yeah.  After my work when I go off I used to write.

20   Q.   Would you do that on every day that you'd come home --

21   you wrote your work?

22   A.   Yes.  Every day.

23   Q.   Okay.  And those are the records -- those are your

24   records that you prepared, correct?

25   A.   Yes.

Lal - Cross                                110

1                   MR. SILVER:  I offer it into evidence as Plaintiff's

2       8.

3                   THE COURT:  Received.

4                        (Plaintiff's Exhibit 8, Received.)

5                   MR. SILVER:  Nothing further.

6                   THE COURT:  May I see the document?  When did you

7       give this to Mr. Silver?

8                   THE WITNESS:  When he started the case.

9                   THE COURT:  Mr. Markovski.

10                          CROSS-EXAMINATION

11      BY MR. MARKOVSKI:

12      Q.   Mr. Lal, what job sites are these hours for?

13      A.   I work two, three days in Flushing and the rest of the

14      days I worked in Brooklyn.

15      Q.   What days were in Flushing and what days were in

16      Brooklyn?  In Brooklyn, there's two job sites.

17      A.   I didn't -- I didn't write in that way.  I wrote what are

18      the days I worked so I didn't separate the locations.

19      Q.   So who would tell you to go to Flushing or to do job

20      sites in Brooklyn?

21      A.   I started at the beginning in Flushing.

22      Q.   Correct.  But since you don't have a breakdown of the

23      locations, who would tell you where to go today in Queens,

24      tomorrow in Brooklyn?

25      A.   There was a supervisor used to be present there.  I did

1  two or three days in Flushing and he used to tell me that you

2  have to go to Brooklyn now.

3            THE COURT:  Do you remember his name?

4            THE WITNESS:  I don't remember the name.

5            MR. MARKOVSKI:  Who was he working for?

6            THE COURT:  Who was he working for; the supervisor?

7            THE WITNESS:  For Sasha.

8            THE COURT:  Was it Puma Singh, this supervisor?

9            THE WITNESS:  No.

10 BY MR. MARKOVSKI:

11 Q.    How were you getting to the job sites?

12 A.    I used to go to Brooklyn with my own car.

13 Q.    Have you ever worked for Sunn Enterprise Group before

14 these job sites?

15 A.    No, never before.

16 Q.    How did you find out that Sunn Enterprise Group had work

17 at these three job sites?

18 A.    Yeah.  So we walked all people together every place.

19 Whoever doesn't have a job ask others to find a job.  So I

20 think I asked -- I asked Baljinder Kumar and Baljinder Kumar

21 told me yes, there are job available.  This is the person,

22 Sasha.  You should talk to him.  So then I went to talk to

23 Sasha.

24 Q.    When and where did you ask Sasha for employment?

25 A.    Flushing.  I started to work there.

Lal - Cross                                    112

1   Q.   How did you know to show up that first day to work

2   without talking to somebody prior from Sunn Enterprise work?

3   A.   Baljinder Kumar told me.

4   Q.   So he hired you?

5   A.   No.

6   Q.   Who hired him?

7   A.   He told me there was job available.  He told me if you

8   need work so you come with me and Sasha has job for you.

9   Q.   So that individual told him that there's work available

10  and he just went over there and he started working?

11            THE COURT:  That's not a question.

12            MR. SILVER:  Is that a question?

13            THE COURT:  You can ask him a question.

14            MR. MARKOVSKI:  I'm sorry.

15  BY MR. MARKOVSKI:

16  Q.   So that individual told you that there's work there, and

17  you just showed up and you started working?

18  A.   Just say it again, please.  Repeat again question.

19            THE COURT:  When you got to the job site for the

20  first time, did you meet with Sasha before you started to

21  work?

22            THE WITNESS:  Yes, I did.

23            THE COURT:  And he offered you $300 a day to work on

24  the job site?

25            THE WITNESS:  Yes.  He told me I pay other for the

1  brick work $300 a day.  If you really want the job, you can

2  get $300 a day, you can start.

3          THE COURT:  Who told you what to do?

4          THE WITNESS:  First Baljinder Kumar told me that a

5  job is available for bricks and pointing.  You have to go

6  there and ask what are jobs available for you.

7          THE COURT:  When you got on the job site, who told

8  you where you were assigned to work and what your tasks were?

9          THE WITNESS:  There's a person with Sasha, maybe

10  supervisor, he used to tell that you should go there, there's

11  job there.  You go there, like that.

12  BY MR. MARKOVSKI:

13  Q.   So every time -- every day that you showed up on the job

14  site, Sasha was there?

15  A.   Yes, I saw him in Flushing one and then when I went to

16  Brooklyn, I saw him twice.

17  Q.   So it was not Sasha instructing you what to do; correct?

18  A.   Sasha told me first time that what are the jobs available

19  and what to do.  On a regular basis the supervisor used to

20  tell me where is the job and what to do that day.

21  Q.   In what language did you have that interview with Sasha?

22  A.   Baljinder Kumar used to speak Punjabi.  Baljinder Kumar

23  used to have contact with Sasha.  I don't know.  Maybe

24  Baljinder Kumar explained to Sasha and Baljinder Kumar

25  communicated to me that there are jobs available.  So he used

Lal - Cross                                     114

1    to communicate in between.

2    Q.   So the individual -- what was his name?  Baljinder?

3    Right?  Baljinder.  Uh-huh.

4    A.   Baljinder.

5    Q.   Baljinder, yeah.

6              THE COURT:  His name is Kumar or Singh Baljinder?

7              THE WITNESS:  Maybe Baljinder Kumar Singh or Kumar,

8    but everybody calls him Baljinder.  And his short name was

9    Sammy.

10             THE COURT:  He's one of the plaintiffs here?

11             MR. MARKOVSKI:  Yes.

12             THE COURT:  I'm not asking you.  I'm asking the

13   witness.

14             MR. MARKOVSKI:  Oh, I'm sorry.

15             THE WITNESS:  Yes.

16   BY MR. MARKOVSKI:

17   Q.   So everyone that you wanted to find out about the

18   company, about the job, about the work available, Baljinder

19   was translating for you?

20   A.   Yes, sometimes, but whenever the supervisor was there, I

21   could communicate some common things.  While you were work you

22   can communicate.  So I did. When in the Brooklyn I don't have

23   to talk anyone.  I knew what jobs is to be done by me so I

24   could do the work.  I don't have to talk to anyone.

25   Q.   So you just went to Brooklyn and started working without

                        Lal - Cross                          115

1   any direction on what to do?

2           MR. SILVER:  Objection.

3           THE COURT:  Sustained.

4   BY MR. MARKOVSKI:

5   Q.   Did Puma ever tell you how much you're going to get paid?

6   A.   No.

7   Q.   Did you ever go to Sunn Enterprise's office to fill out

8   any applications or any paperwork?

9   A.   I didn't go.

10  Q.   Why?

11          MR. SILVER:  Objection.

12          THE COURT:  Sustained.

13  BY MR. MARKOVSKI:

14  Q.   After not getting paid the first week, did you contact

15  Sunn Enterprise's office and ask why?

16  A.   I never thought that I would not get paid.  Sometimes

17  some place they might wait for one or two weeks.  I thought I

18  would get paid anyway.  I never thought I'd never get paid.

19  Q.   So after the second week, did you call Sunn Enterprise's

20  office and ask why?

21  A.   No, I didn't.

22  Q.   After the third week, did you call Sunn Enterprise's

23  office?

24  A.   No, I didn't because I thought I'll get paid it anyway.

25  So sometimes the money may come late.  It could be late but

                        Lal - Cross                       116

1   I'll get the money anyway.  That's why I didn't call.

2   Q.   After the fourth week, did you call Sunn Enterprise's

3   office?

4   A.   After that I already left the job.

5   Q.   I believe you were present on the job site more than five

6   weeks; weren't you?

7              THE COURT:  Twenty-two days he's claiming.  That

8   would be four weeks and two days.

9              THE INTERPRETER:  Twenty-two days is three weeks.

10             THE COURT:  Twenty-two days of work and two days,

11  Mr. Interpreter.  Did you ever call Sunn to complain about not

12  getting paid at any time?

13             THE WITNESS:  No, I didn't call but I thought other

14  people didn't get the money so when they get the money, I'll

15  get the money, so I didn't call.

16  BY MR. MARKOVSKI:

17  Q.   Did you ask Puma when you're going to get paid?

18  A.   I ask -- I ask everyone.  Everyone ask each one the way

19  to get the money.  So each one talked maybe later but we get

20  the money.

21  Q.   Did you know that there was some other workers that got

22  paid?

23  A.   No, I don't know.  Maybe before me because when I started

24  working in Flushing I didn't know.

25  Q.   Have you ever worked with Mr. Puma before?

117

1   A.   No, I didn't.

2              MR. MARKOVSKI:  No more questions, Your Honor.

3              THE COURT:  Mr. Silver, anything?

4              MR. SILVER:  Nothing further.

5              THE COURT:  Do you have any other witnesses?

6              MR. SILVER:  Just one more.

7              THE INTERPRETER:  He has one thing to say.

8              THE COURT:  No.  He doesn't get to say.

9                     [Pause in proceedings.]

10             THE COURT:  Mr. Devender Singh?

11             MR. SINGH:  Yes, sir.

12             THE COURT:  I remind you you are still under oath.

13             MR. SILVER:  I'm sorry.  Not Devender.  Mohinder.

14             MR. SINGH:  Mohinder.  I'm Devender.

15             THE COURT:  How come I know your clients better than

16  you do?

17             MR. SILVER:  I'm sorry.

18             THE COURT:  Who are you looking for?

19             MS. SILVER:  I thought I was looking for Devender

20  but maybe I'm just not paying attention.

21             THE COURT:  This is the first gentleman who first

22  testified.  Is that the --

23             MR. SILVER:  Not Devender.  Mohinder.  Mohinder I

24  did already.  Oh, I'm sorry.  I guess I'm done.  I'm sorry.  I

25  don't often ask questions of 11 witnesses --

Devender Singh - Recross                    118

1            THE COURT:  What do you want?

2            MR. SILVER:  Maybe I missed somebody?

3            THE COURT:  What are you asking for?

4            MR. SILVER:  May I have an opportunity to just go

5    outside and make sure I've had everyone testify?

6            THE COURT:  Absolutely.  First, though, did you say

7    you had a question you wanted to ask this man?

8            MR. MARKOVSKI:  Yes.

9            THE COURT:  Go ahead.

10                        RECROSS EXAMINATION

11   BY MR. MARKOVSKI:

12   Q.   Mr. Singh, on the job sites that you worked at, the two

13   in Brooklyn and the one in Flushing, did you sign any time

14   sheets --

15   A.   Yeah.

16   Q.   Okay.  What was the company name?

17   A.   Sunn Enterprises.

18   Q.   It was Sunn Enterprises on the time sheets.

19   A.   Yes.  Yes.

20   Q.   When I asked the question before if there was another

21   company's name besides Sunn Enterprise on the other sheets,

22   you raised your hand and you said you had signed other besides

23   Sunn Enterprise Group.

24   A.   No.

25            MR. SILVER:  Objection.  He omitted phrases.

Devender Singh - Recross                      119

1          THE COURT:  Overruled.  Did you indicate while you

2     were in the courtroom that you signed time sheets for someone

3     other than Sunn?  Did you mean to?

4          THE WITNESS:  No.

5          THE COURT:  Anything else?

6     BY MR. MARKOVSKI:

7     Q.     Do you have copies of those sign in sheets?

8     A.     No.  They didn't give it to me.

9          MR. MARKOVSKI:  That's it.

10          THE COURT:  You're excused.  Did you call everybody

11     you meant to call?  I believe we have testimony from everybody

12     except Jarnail --

13          MR. SILVER:  Jarnail is the only one that's not

14     available.  He's in India.

15          THE COURT:  So he's out.

16          MR. SILVER:  That's it.  Yeah.

17          THE COURT:  Do you have anything else you wanted to

18     present to the Court?

19          MR. SILVER:  No.

20          THE COURT:  I want to make sure we have all the

21     exhibits.  Can I see the exhibits that have been received?

22     Thank you.

23                    [Pause in proceedings.]

24          THE COURT:  Now, Mr. Markovski, did you say you

25     wanted to make a statement?  Before you do, just answer my

120

1    question yes or no first.

2              MR. MARKOVSKI:  Yes.

3              THE COURT:  If it's about the facts of the case and

4    you want me to take it into account, I need to place you under

5    oath.

6              MR. MARKOVSKI:  That's fine.

7              THE COURT:  Excuse me.  Not only do I have to place

8    your under oath, but I have to give Mr. Silver the opportunity

9    to ask questions.

10             MR. MARKOVSKI:  That's fine.

11                 BOGDAN MARKOVSKI, DEFENDANT, SWORN

12             THE COURT:  Please be seated and state your name.

13   You can have a seat.

14             MR. MARKOVSKI:  Bogdan Markovski.

15             THE COURT:  What did you want to tell the Court, Mr.

16   Markovski?  And you can offer any other exhibits you want me

17   to see as well.

18             MR. MARKOVSKI:  I don't have any other exhibits

19   besides the ones that I presented.

20             Sunn Enterprise Group has done work with Mr. Singh

21   in the past.

22             THE COURT:  Which Singh?  Everybody was Singh, Puma?

23             MR. MARKOVSKI:  Puma Singh.  I'm sorry.  And his

24   company or allegedly his wife's company's name, PNS

25   Contracting Corp.  There was a case over here as well.  There

1   is a balance that's owed to PNS Contracting Corp., yes.

2   There's a balance that's owed to Sunn Enterprises, a much

3   larger balance on those three job sites.  Some of those

4   balances, you know, came from defective work from PNS

5   Contracting Corp. and some of the other subcontractors that we

6   had on the job site.  We had roofing.  We had scaffolding.  We

7   had metal sheetwork done on the job site.

8          The checks that were given to PNS through Mr. Puma

9   Singh, they were given -- every time something came in we

10  would pay him as well as the other subcontractors that we

11  paid.  We had some supervisors on the job sites as well so

12  they was part of the payroll.  So whatever Sunn Enterprise has

13  received and given out, it's much more than was given out than

14  received.

15         Okay.  We were -- we were not able to obtain counsel

16  to go after them but we will now and that one company that was

17  mentioned prior, Z Barclay, that was the company that we have

18  a contract with, and these jobs were all private jobs.  None

19  of them carry prevailing wages.  The men work hard and they

20  need to be paid, correct.  And I acknowledge that there's a

21  balance that's owed to PNS Contracting Corp., correct.

22         I believe that whatever balance was paid to PNS

23  Contracting Corp. was not distributed properly and when I say

24  properly I mean for the labor.

25         With that said, I believe in our judicial system and

Markovski - Cross                              122

1    I believe that, you know, the truth will prevail and --

2              THE COURT:  Is there a contract between Sunn and

3    PSNY?

4              MR. MARKOVSKI:  No, there is not.  We have never had

5    a contract even previous but every job that he has done his

6    men work hard and he was always paid, always paid, and I can

7    show checks from previous jobs just like the one in Jersey,

8    just like other ones.  Okay.  But it was a verbal agreement,

9    but obviously whatever check that's given, the verbal becomes

10   a concrete contract.  Okay.

11             THE COURT:  Was the contract for a fixed sum or

12   costs plus?

13             MR. MARKOVSKI:  Yes, yes.  It was for $60,000 for --

14             THE COURT:  For all three jobs?

15             MR. MARKOVSKI:  For all three jobs, correct.  Okay.

16   He was only paid 32 and half, so there's a balance due there.

17             THE COURT:  Well, I understand what you're saying.

18   I'm not sure given the legal context that we're in what can be

19   done about it.

20             Mr. Silver, do you have any questions for Mr.

21   Markovski?

22                        CROSS-EXAMINATION

23   BY MR. SILVER:

24   Q.    Who is Dennis?

25   A.    He was one of the project managers on the site.

Markovski - Cross                    123

1  Q.   When you say project manager, you mean your project

2  manager?

3  A.   Correct.

4  Q.   And his job was to be assigned to the different locations

5  every day?

6  A.   No.  He was, as far as I remember, he was on -- he was on

7  the Aberdeen Street I believe.

8  Q.   And who was in charge of the other two locations?

9  A.   There was two other gentlemen that were over there.  The

10 one gentlemen his name is Miko and the other gentleman was, I

11 forgot his name.  Oh, Demetria.  That was his name.

12 Q.   And they were all your employees?

13 A.   Correct.

14 Q.   They got paid?

15 A.   Correct.

16 Q.   Sasha, what's Sasha's proper name?

17 A.   Sasha, Sasha.

18 Q.   Sorry?

19 A.   Sashko.  S-A-S-H-K-0.

20 Q.   That's the first name or last name?

21 A.   First name.

22 Q.   What is the last name?

23 A.   Last name is G-E-G-O-S-K-I.

24 Q.   And he is your partner?

25 A.   He works for the company and he was in charge of the

Markovski - Cross                    124

1  construction division.  There's several divisions of the

2  company.

3  Q.   So when you're saying he was charge of the construction,

4  I mean, for example, work is being done at the church in

5  Flushing and he was in charge of that operation?

6  A.   Correct.

7  Q.   So when he --

8  A.   [Inaudible].

9  Q.   So my question is when he was there, he's in charge, he's

10 the one that communicates with everyone working?

11 A.   No.  The only person he communicates with is the

12 supervisor on the site for all the other trades including what

13 PNS, you know, performed.  Okay.  And with Puma.

14 Q.   So you have no knowledge -- you've never been to any of

15 these work sites?

16 A.   I had to go for meetings.

17 Q.   Then the answer is no, you've never been there?

18 A.   I've been to the job sites for meetings purposes only.

19 Q.   All right.  So which of the gentlemen who testified today

20 do you -- do you know if of them if they were there or not?

21 A.   I only know Puma.

22 Q.   Do you know any of the other guys?

23 A.   I was present when they came with Puma at my office.

24 Okay.  I just don't remember the faces, but I know there was

25 four or five guys that were there asking for money.

Markovski - Cross                          125

1   Q.    So were there sign in sheets actually prepared by anyone?

2   A.    There was no sign in sheets, you know.   The sign in

3   sheets that were signed on the job sites were not Sunn

4   Enterprises.   There was Flag's.   Flag was the prime contractor

5   on all of these three job sites.   Flag subbed out their work

6   to Z Barclay.   Z Barclay failed to perform the work.   That's

7   when Z Barclay contacted Sunn Enterprises Group to finish the

8   jobs, all three jobs.   Okay.   Flag, since being the prime

9   contractor he is, they did not want anybody to know whether it

10  was the Diocese or the school itself that they were subbing

11  out the work.

12         Okay.   So sign in sheets were being signed under Flag's

13  sign in sheets, just like they were given -- the workers were

14  all given hard hats.   The workers were given shirts and

15  everything else.

16  Q.    So do you have the sign in sheets?

17  A.    No, I do not.

18  Q.    Do you have any records at all showing who worked there

19  and what hours they put in?

20  A.    No, because I did not have -- I did not have the prime

21  contract with Flag so --

22  Q.    So your agreement with -- I'm sorry.

23             THE COURT:   Let him finish the answer.

24             MR. SILVER:   I'm sorry.

25  A.    I tried -- we found retaining a legal counsel.   I tried

Markovski - Cross                          126

1    contacting the Diocese and I tried contacting the school as
2    well and have records of those.  Okay.  But since I don't have
3    the prime contract with them there's nothing I can do like
4    that.  It has to be followed with steps.  I got to go after Z
5    Barclay and eventually it trickles to Flag, the Archdiocese
6    and the school itself.
7    Q.    How much was your contract with them -- to whom was the
8    prime contractor for the church that you had a contract with?
9    A.    Flag.
10   Q.    Flag?
11   A.    Flag.
12   Q.    How much was that contract?
13   A.    I'm not really sure.
14   Q.    You don't know how much your contract was?
15   A.    How much was my contact?
16   Q.    How much were you going to be paid for the work performed
17   at the church?
18   A.    That I have.  I thought you asked me how much was their
19   contract.
20   Q.    Do you have the contract?
21   A.    I do not have the contract --
22   Q.    You just have a piece of paper you wrote it down on?
23   A.    No.  This is --
24            THE COURT:  Mr. Silver, come on.  You can ask him --
25            THE WITNESS:  I'm sorry.  I'm going to back away.

Markovski - Cross                          127

1   A.   This is -- this is the last correspondence that I had

2   with Z Barclay and Flag's personnel was contacted.  This is

3   the amounts that are owed to Sunn Enterprise.

4   Q.   And I don't see that.  Tell me how much.

5        MR. SILVER:  May I approach?

6        THE COURT:  Sure.

7   A.   And when we spoke on the phone, Mr. Silver --

8   Q.   I haven't asked you a question.  Just wait for my

9   question, please.

10       This list, the principal amount due for three projects,

11  but it doesn't indicate how much the entire cost was but with

12  this alone, the principal amount due on 29th Street was

13  76,000, on Aberdeen 120,000, and on Parsons 87,000.

14  A.   Correct.

15  Q.   How much was the entire Parsons project going to pay --

16  how much was Sunn going to get paid for the entire project?

17  Parsons Boulevard.

18  A.   Parsons Boulevard.

19       THE COURT:  What's this relevant to, Mr. Silver?

20       MR. SILVER:  Well, the claim is that there's a

21  certain amount of money that he was going to pay the guy who

22  played all these people --

23       THE COURT:  Yes.

24       MR. SILVER:  -- which really is completely --

25  [inaudible] on the entire amount of the contract so it's

```
                    Markovski - Cross                    128
```

 1  somewhat incredible.

 2          THE COURT:  But the contract -- I'm sorry.  The

 3  contract covered a lot more work than the brick.

 4          MR. SILVER:  Well, I don't know that, but I will ask

 5  that.

 6          THE COURT:  It's pretty clear from what Mr.

 7  Markovski has already said.

 8          How many trades did you cover for -- were you hired

 9  to --

10          MR. MARKOVSKI:  There was metal.  There was roofing.

11  We had some scaffolding and we had masonry.  This is the

12  original contract for Parsons Boulevard.  This is the three

13  checks that we had received.  These are all the change orders

14  that we had and this is the outstanding balance for Parsons

15  Boulevard.

16  BY MR. SILVER:

17  Q.   How many people other than these people who weren't paid

18  and those other people who were paid that Mr. Puma talked

19  about, how many -- other than that group, were there any other

20  employees working there for any other subcontractors?

21  A.   Sure.

22  Q.   How many other subcontractors and how many other

23  employees?

24  A.   I have no idea to tell you the truth.

25  Q.   Well, you gave the list of all this work done.  I mean

Markovski - Cross                        129

1   how many other people do you claim that you had subcontracts

2   with other than --

3              THE COURT:  How many companies did you subcontract

4   with?

5              MR. SILVER:  The companies.  Yeah.  Oh, how many

6   companies you subcontracted?

7              THE COURT:  Is it PSNY, right?  Is it PSNY or PNSY?

8              MR. MARKOVSKI:  PNS.  We had K&S Home Improvements.

9   We had CMG Sheet Metal Installment, Inc. and we had Cabrera

10  general contractors.

11  BY MR. SILVER:

12  Q.   Were there a number of laborers for these other

13  subcontractors?

14             THE COURT:  They had workers on the site, too?

15             MR. MARKOVSKI:  Sure.  They had their own workers

16  just like PNS had their own --

17  BY MR. SILVER:

18  Q.   I'm looking at this group of 20 some-odd people and I'm

19  just wondering how many people in total were there for all

20  these other subcontractors.

21             MR. SILVER:  I'm sorry.  Let me withdraw that.

22  Q.   I'm trying to figure out what portion of the work the

23  costs of the labor was this cost as opposed to the other --

24  A.   It was $60,000.

25  Q.   I heard you say that number and does that mean -- that's

                    Markovski - Cross                    130

1   just a number that you agreed to?

2   A.    Correct.

3              THE COURT:  With Puma?

4              MR. MARKOVSKI:  With Puma, yes.

5              THE COURT:  And is that in writing anywhere?

6              MR. MARKOVSKI:  No, but I did pay three checks as

7   they were coming in.

8              THE COURT:  That's the 32.5 we looked at?

9              MR. MARKOVSKI:  Correct.

10  BY MR. SILVER

11  Q.    So regardless of how much labor was involved, you were

12  only paying a certain defined sum of money?

13  A.    Correct, because he went to -- he says you guys have,

14  yes.  Here's the work.  Go pick up work.  He looks at it.

15  Does this.

16             THE COURT:  He did it like any other sub?

17             MR. MARKOVSKI:  Just like anybody else.

18             MR. SILVER:  I have nothing further.

19             THE COURT:  All right.  As I said before, I think

20  it's -- give him his paper back.

21             MR. SILVER:  I'm sorry.

22             THE COURT:  I don't think anybody is lying outright

23  here.  I accept the testimony about the number of hours these

24  folks worked.  I'm a little concerned, Mr. Silver, about two

25  things on your behalf.

1          One is, some of these people signed affidavits and

2    they had no idea what they said and you should not let your

3    clients do that and the content of those affidavits was in

4    some cases at minimum inaccurate and maybe fraudulent.

5          Number two, I have no idea what these charts your

6    office prepared.  I assume it was your office.  Had to do with

7    anything that the affidavit said, and that's how we got into

8    this situation in the first place.  I don't know what was

9    going on there, but you weren't paying attention.

10         Number three, these people said that they gave these

11   records which a skeptic might suggest were created after the

12   fact to you at the beginning of this lawsuit.  Is that your

13   representation to this Court?

14         MR. SILVER:  No, I received them early on.

15         THE COURT:  In the litigation?

16         MR. SILVER:  Yes.

17         THE COURT:  I will tell you what I am inclined to

18   recommend and give each side an opportunity to submit

19   something in the next few days or for you to hire a lawyer if

20   you think you want to fight this.

21         I'm inclined to recommend an award of these wages,

22   but I want to look into whether liquidated damages are

23   appropriate or not in this case.

24         Mr. Silver's clients are asking to be paid twice

25   what they're owed because under the Fair Labor Standards Act

132

1   the act provides for minimum wage, overtime and the right to

2   sue if you don't get paid.  You're entitled to double what's

3   owed to you if your employer doesn't pay you what you're owed.

4   I believe that the case law will provide that that is only a

5   remedy when the employer did not act in good faith.  I am

6   inclined to conclude from what I've heard so far that this was

7   the product of perhaps a miscommunication or a

8   misunderstanding between Puma Singh and Mr. Markovski about

9   who was going to be responsible for paying these individuals

10  rather than a deliberate stiffing by Mr. Markovski of people

11  he believed to be working directly for him.

12          If I so rule and if Judge Cogan accepts it, to the

13  extent that PSN has a claim for monies that are still due

14  under the $60,000 agreement, that claim will be extinguished

15  by virtue of the payment of these wages up to the -- or at

16  least diminished by the amount that's recovered.  Do you

17  understand what I'm saying?

18          MR. MARKOVSKI:  I understand.

19          THE COURT:  So, in other words, if I order Mr.

20  Markovski -- I don't know what the wage total of these 11

21  folks comes out to, but let's say it's $30,000.  I just don't

22  remember.  And he pays that 30 and he's already paid the 32.5,

23  he's done with the contract and it's going to be a set-off

24  against any claim that PSN might have for outstanding balance.

25  I think that's the fairest result I can come to within what

1  the law says after you've defaulted and essentially admitted

2  you were their boss, Mr. Markovski, but it seems to me from

3  this testimony that there was never any real employment

4  contract.

5          I know you have a right to collect your attorney's

6  fees but frankly if you had prepared an appropriate set of

7  papers that were internally consistent in support of your

8  motion for entry of default judgment, we probably wouldn't

9  have had this hearing.  And so the time you spent organizing

10 and preparing for this hearing and conducting it is on you,

11 Mr. Silver.

12          MR. SILVER:  Understood.

13          THE COURT:  I don't want the fee application to

14 include it.

15          When are you going to get your fee application in?

16          MR. SILVER:  Can I do it when I come back from

17 vacation?

18          THE COURT:  Yes.  When is that?

19          MR. SILVER:  I'll be back on the 24th.

20          THE COURT:  Do you want to say November 1st?

21          MR. SILVER:  If I could have another week.

22          THE COURT:  November 8th.

23          MR. SILVER:  November 8th would be great.

24          THE COURT:  Okay.  You seem like a pretty smart guy,

25 Mr. Markovski so I think --

134

1          MR. MARKOVSKI:  Thank you.

2          THE COURT:  -- you understand everything I've said,

3     or at least I hope you do.  If you have a question about it, I

4     hope you feel free to ask it.

5          MR. MARKOVSKI:  Before we got to this, I offered,

6     you know, to Puma here to go after together, but I don't know

7     what happened and I tried calling him several times and, you

8     know, I was not able to contact him.  I had other work, you

9     know, that I wanted to put him on somehow to compensate for

10    it, but the next thing I know here we are.

11          We have standard practices, very strict practices on

12    employment.  Okay.  Safety practices, payments and everything.

13    We do major jobs, okay, for the city, for the government, and

14    you know, for something like this to get my reputation ruined

15    it's not worth it, you know.  I apologize for taking this

16    long.  It just -- this is my first time in litigation.  So,

17    whether I should have acted in a different way, you know,

18    gotten a lawyer or anything, you know, that's on me.  I

19    understand, but I'm not here to hurt anybody at all.  And

20    that's it, Your Honor.

21          THE COURT:  Okay.  I'll do my best.  The way this

22    works is I'm a magistrate judge, not a district judge, so I'm

23    like a lower level judge.  The district judge is Judge Cogan.

24    He's the one who's already held you in default.  He then asked

25    me to hold a hearing to determine how big a judgment should be

135

1   entered against you.  I can only write what's called a report

2   and recommendation.  Once I write that, and that's going to be

3   the end of November probably because I'm not even going to get

4   Mr. Silver's fee application until the beginning of November.

5   It could be end of November, could be December.  Once that's

6   written and it's out, you have two weeks to file objections.

7   So if you want to litigate any of this further, you're going

8   to have either write your own pro se objections and you can

9   only do that on your own behalf and the judgment will be still

10  entered against Sunn because the law is crystal clear that a

11  corporation has to appear through a lawyer, not a lay person.

12  Or you better get a lawyer and have him read the minutes of

13  what happened here.  He can order a transcript of everything

14  that happened here and everything I've said and be ready to

15  hit the ground running when that two week time period starts

16  once I issue that report.

17          MR. MARKOVSKI:  Am I allowed to get the minutes on

18  my own?

19          THE COURT:  Yes.  Yes.  I mean, you've got to pay

20  for them.  They're expensive but you can get them.  They'll

21  tell you how to order them.  These are my law clerks, Mr.

22  Metzka and Mr. Reka (phonetic) and they will help you figure

23  out how to give you the paperwork you need or the contact

24  information you need to order the minutes.  The quicker you

25  want them the more you have to pay for them.  I think there's

136

1   a rate for two days, a rate for a week and a rate for 30 days.

2   I think so.  Does that sound right, guys?

3              THE CLERK:  Yes.

4              THE COURT:  It's a per page rate and I don't know

5   how many pages it's going to be.  Probably about 100 to two --

6   between 100 and 200 pages.

7              MR. MARKOVSKI:  Okay.

8              THE COURT:  All right.

9              MR. MARKOVSKI:  Okay.

10             THE COURT:  Anything?

11             MR. SILVER:  Nothing further, Your Honor.

12             MR. MARKOVSKI:  Thank you.

13             THE COURT:  Goodnight.

14  (Proceedings concluded at 6:35 p.m.)

15                        *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

137

1          I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                        Shari Riemer, CET-805

7    Dated:  October 29, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25